J. AL LATHAM, JR. (Cal. State Bar No. 71605)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
515 South Flower Street, 25th Floor
Los Angeles, California  90071-2228
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705
allatham@paulhastings.com

JEFFREY D. WOHL (Cal. State Bar No. 96838)
JEFFREY P. MICHALOWSKI (Cal. State Bar No. 248073)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
55 Second Street, 24th Floor
San Francisco, California  94105-3441
Telephone: (415) 856-7000
Facsimile: (415) 856-7100
jeffwohl@paulhastings.com
jeffmichalowski@paulhastings.com

WILLIAM C. BARKER (Ga. State Bar No. 037727) (*pro hac vice*)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
600 Peachtree Street NE, Suite 2400
Atlanta, Georgia  30308
Telephone:  (404) 815-2400
Facsimile:  (404) 815-2424
corybarker@paulhastings.com

Attorneys for Defendants
AT&T Corp., Pacific Bell Telephone Company,
and AT&T Communications of California, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOE LEWIS LUQUE AND HERMAN RICHARDSON, Individually and On Behalf of All Others Similarly Situated<br><br>Plaintiffs,<br><br>vs.<br><br>AT&T CORP., PACIFIC BELL TELEPHONE CO. d/b/a AT&T CALIFORNIA, AND AT&T COMMUNICATIONS OF CALIFORNIA, INC.,<br><br>Defendants. | No. C-09-5885-CRB<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION OF COLLECTIVE ACTION UNDER FLSA**<br><br>Date:        September 24, 2010<br>Time:        10:00 a.m.<br>Ctrm:        8, 19th Floor<br>Judge:       Hon. Charles R. Breyer |

**TABLE OF CONTENTS**

*Page*

Table of Authorities .................................................................................................... iii

I.  INTRODUCTION/SUMMARY OF ARGUMENT ................................................. 1

II.  FACTUAL BACKGROUND ................................................................................. 2

    A.  Field Managers Work in Distinct Departments with Distinct Functions. ...... 2

        1.  Installation & Maintenance ("I&M") ........................................... 3

        2.  Construction & Engineering .......................................................... 5

        3.  U-verse ............................................................................................ 5

        4.  AT&T Corp. .................................................................................... 6

    B.  Defendants' Written Expectations for Field Managers Demonstrate That Plaintiffs' Claimed Work Experiences Are Not Consistent With Defendants' Intended Job Design ............................................................................................ 6

    C.  A Scientific Survey of 367 Field Managers Shows That Plaintiffs' Claimed Work Experiences Are Not Typical of Field Managers Generally ................... 9

    D.  Thirty Field Manager Declarations Presented by Defendants Show That Field Manager Work Experiences Differ Widely and Are Not Appropriate for Collective Treatment ....................................................................................... 10

        1.  Field Managers Make Decisions Regarding Discipline, Suspension and Termination or Recommendations That Are Given Particular Weight ............. 10

        2.  Field Managers Exercise Discretion in Directing Work Assignments ............. 11

        3.  Field Managers Provide Informal Training ........................................ 13

        4.  Field Managers Resolve Grievances ................................................ 13

        5.  Field Managers Evaluate Performance with Subjective and Objective Factors ........................................................................................ 14

III.  THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR CONDITIONAL CLASS CERTIFICATION UNDER THE FLSA ................................................... 15

    A.  To Win Certification, Plaintiffs Must Show They Are Similarly Situated to the Class They Seek to Represent ......................................................................... 15

    B.  Conditional Certification of the Executive or Administrative Exemption Necessarily Turns on Individual Assessments and Complex Factual Determinations ............................................................................................... 18

    C.  Plaintiffs Have Not Met Their Burden of Proving They Are Similarly Situated to the Proposed Class ..................................................................................... 20

        1.  Plaintiffs' Proposed Class Includes Disparate Field Manager Positions That Are Not the Same in Terms of Their Organizational Responsibilities ............................................................................... 20

        2.  The Field Research Survey Convincingly Proves That Plaintiffs Are Not Similarly Situated to Field Managers in General ............................. 22

        3.  Plaintiffs' Eighteen Declarations Have No Probative Value with Respect to Other Field Managers .................................................................. 23

**TABLE OF CONTENTS**
(*cont'd*)

*Page*

    4.    The Deposition Testimony of Plaintiffs, Opt-ins, and Other Declarants Also Show That Plaintiffs' Claims Are Not Appropriate for Collective Treatment ................................................................................................. 24

    5.    The Depositions Reveal a Multitude of Credibility Conflicts That Cannot Be Resolved Without Individualized Adjudications .......................................... 31

  D.    The *Perkins* Certification Is Inapposite to This Court's Determination in This Case ............................................................................................................. 33

IV.    PLAINTIFFS' PROPOSED NOTICE IS DEFICIENT ............................................ 33

V.    CONCLUSION ................................................................................................. 35

1

2

## TABLE OF AUTHORITIES

*Page*

3

**Cases**

4

*Aguirre v. SBC Commc'ns, Inc.*,
Civ. A. No. H-05-3198, 2007 WL 772756 (S.D. Tex. Mar. 12, 2007) ................................... 15, 20

5

*Austin v. CUNA Mut. Ins. Soc'y*,
232 F.R.D. 601 (W.D. Wis. 2006) ......................................................................................... 16

6

*Barfield v. New York City Health & Hosps. Corp.*,
No. 05 CIV. 6319 (JSR), 2005 U.S. Dist. LEXIS 28884 (S.D.N.Y. Nov. 17, 2005) ..................... 24

7

8

*Bishop v. Petro-Chem. Transport, LLC*,
582 F.Supp.2d 1290 (E.D. Cal. 2008) .................................................................................. 16

9

*Boyd v. Jupiter Aluminum Corp.*,
No. 2:05-CV-227 PPS APR, 2006 U.S. Dist. LEXIS 35654
(N.D. Ind. May 31, 2006) .................................................................................................... 16, 34

10

*Cooke v. Gen. Dynamics Corp.*,
993 F. Supp. 56 (D. Conn. 1997) ......................................................................................... 19

11

*De La Cruz v. El Paso County Water Improvement Dist. No. 1*,
No. EP-05-CV-206-FM, 2005 U.S. Dist. LEXIS 21244 (W.D. Tex. Sept. 19, 2005) ................... 24

12

*Dolan v. Project Constr. Corp.*,
725 F.2d 1263 (10th Cir. 1984), *overruled in part by Hoffmann-La Roche*,
493 U.S. 165 (1989) ............................................................................................................ 16

13

14

*Donihoo v. Dallas Airmotive, Inc.*,
No. 3:97-CV-0109-P, 1998 U.S. Dist. LEXIS 2318 (N.D. Tex. Feb. 20, 1998)........................... 17

15

*Freeman v. Wal-Mart Stores*,
256 F. Supp. 2d 941 (W.D. Ark. 2003) ................................................................................. 17

16

*Gerlach v. Wells Fargo & Co.*,
No. C 05-0585 CW, 2006 U.S. Dist. LEXIS 24823 (N.D. Cal. Mar. 28, 2006) ....................... 34, 35

17

18

*Held v. Nat'l R.R. Passenger Corp.*,
101 F.R.D. 420 (D.D.C. 1984) ............................................................................................. 34

19

*Hernandez v. United Auto Credit Corp.*,
No. C-08-03404 RMW, 2010 WL 1337702 (N.D. Cal. Apr. 2, 2010) ......................................... 19

20

*Hinojos v. Home Depot, Inc.*,
No. 2:06-CV-00108, 2006 U.S. Dist. LEXIS 95434 (D. Nev. Dec. 1, 2006) ............................... 23

21

22

*Hoffman-La Roche, Inc. v. Sperling*,
493 U.S. 165 (1989) .................................................................................................*passim*

23

*Johnson v. Am. Airlines, Inc.*,
531 F. Supp. 957 (N.D. Tex. 1982) ...................................................................................... 35

24

*King v. ITT Cont'l Baking Co.*,
No. 84 C 3410, 1986 U.S. Dist. LEXIS 29321 (N.D. Ill. Feb. 18, 1986) ................................... 34

25

*King v. West Corp.*,
No. 8:04CV318, 2006 WL 118577 (D. Neb. Jan. 13, 2006)........................................... 17, 20

26

27

*Lima v. Int'l Catastrophe Solutions, Inc.*,
493 F. Supp. 2d 793 (E.D. La. 2007) ................................................................................... 16

28

# TABLE OF AUTHORITIES
### (cont'd)

*Page*

*McElmurry v. U.S. Bank Nat'l Ass'n,*
No. CV-04-642-HU, 2005 WL 2078302 (D. Ore. July 29, 2005) ........................................... 15, 18

*Mike v. Safeco Ins. Co. of Am.,*
274 F. Supp. 2d 216 (D. Conn. 2003) ...................................................................................... 20

*Morisky v. Pub. Serv. Elec. & Gas Co.,*
111 F. Supp. 2d 493 (D.N.J. 2000) ..................................................................................... 17, 29

*O'Donnell v. Robert Half Int'l, Inc.,*
429 F. Supp. 2d 246 (D. Mass. 2006) ...................................................................................... 24

*Pacheco v. Boar's Head Provisions Co.,*
671 F.Supp.2d 957 (W.D. Mich. 2009) .............................................................................. 16, 17

*Perkins v. Southern New England Telephone Co.,*
669 F. Supp. 2d 212 (D. Conn. 2009) ...................................................................................... 33

*Pfaahler v. Consultants for Architects, Inc.,*
No. 99-C-6700, 2000 U.S. Dist. LEXIS 1772 (N.D. Ill. Feb. 8, 2000) ................................... 17

*Reich v. Homier Distrib. Co.,*
362 F. Supp. 2d 1009 (N.D. Ind. 2005) ................................................................................... 29

*Schwed v. G.E.,*
159 F.R.D. 373 (N.D.N.Y. 1995) ............................................................................................ 34

*Sheffield v. Orius Corp.,*
211 F.R.D. 411 (D. Ore. 2002) .......................................................................................... 15, 18

*Watkins v. Milliken & Co.,*
613 F. Supp. 408 (W.D.N.C. 1984) ......................................................................................... 34

*White v. MPW Indus. Servs. Inc.,*
236 F.R.D. 363 (E.D. Tenn. 2006) .......................................................................................... 24

*Woods v. New York Life Ins. Co.,*
686 F.2d 578 (7th Cir. 1982) ............................................................................................ 17, 34

**Statutes and Regulations**

29 C.F.R.
§ 102 ................................................................................................................................... 18, 19
§ 541.100(a) ............................................................................................................................. 18
§ 541.200(a)(2) ........................................................................................................................ 19
§ 541.200(a)(3) ........................................................................................................................ 19
§ 700 ....................................................................................................................................... 19

29 U.S.C.
§ 213(a)(1) .............................................................................................................................. 18
§ 216(b) ............................................................................................................................. 15, 17
§ 251(a) ................................................................................................................................... 16
§ 251(a)(7) .............................................................................................................................. 16

1    **I.    INTRODUCTION/SUMMARY OF ARGUMENT**

2         Some cases warrant conditional class certification under the FLSA—this case does not.

3    Notwithstanding the relatively low bar required to conditionally certify a class, plaintiffs have failed to

4    establish that they are similarly situated to AT&T Corp. or Pacific Bell field managers, who are first-

5    level managers of outside technicians, throughout California.  Although plaintiffs attempt to portray

6    field managers as a homogeneous group, the evidence proves otherwise: these individuals have different

7    job titles and job functions, and they work in four separate organizations.  Indeed, plaintiffs' evidence is

8    extremely limited in scope and inadequate to certify the sweeping class they seek to represent; plaintiffs

9    have not submitted any declarations for one of the organizations with hundreds of field managers, only

10   one declaration for another organization with hundreds of field managers,  and two declarations from a

11   third organization with only four field managers; the vast majority of plaintiffs' declarations are from

12   one geographic region in the fourth organization..

13        By contrast, defendants submit with this opposition a wealth of evidence showing that plaintiffs'

14   allegations do not represent the experiences of the overwhelming majority of putative class members,

15   including:

16        ▪    a scientific survey of 367 current and former field managers that demonstrates a large

17             majority of field managers regularly manage technician schedules, assignments, and

18             overtime; provide training to technicians; order equipment and tools; routinely assess

19             technician motivation, skill, and performance in order to coach technicians and improve

20             their performance; evaluate technicians based on a combination of subjective and

21             objective factors; and impose discipline, including suspensions and terminations;

22        ▪    numerous policies, guidelines, training materials, and other documents, as well as

23             declarations by field managers' supervisors that show defendants expect field managers

24             to supervise actively, coach, and discipline their technicians, and that defendants expend

25             considerable time and money to provide field managers with the resources to meet these

26             expectations;

27        ▪    thirty declarations from field managers describing their work experiences which not only

28             contrast sharply with the descriptions provided by plaintiffs, but also differ from each

other—reflecting the wide variety of field manager work experiences that plaintiffs obscure through their broad-brush approach to the facts; and

▪ depositions of eleven plaintiffs, opt-ins, and other declarants showing that these individuals' accounts of how they performed their jobs as field managers are at odds with the reported experiences of hundreds of other field managers, and with the documented expectations of AT&T Corp. and Pacific Bell.

All of this evidence demonstrates that plaintiffs' claims are neither representative of the experiences of the class that they seek to represent nor susceptible of adjudication without considering varied evidence unique to each field manager—including performance-related documentation and testimony by their supervisors, peers, and subordinates. In short, to resolve claims on behalf of all field managers in California, the Court would have to examine the work of each individual manager to determine his or her exempt status. This highly individualized and fact-intensive inquiry renders collective treatment inappropriate, even at the notice stage. The Court therefore should deny plaintiffs' motion for conditional certification.

## II.   FACTUAL BACKGROUND

### A.   Field Managers Work in Distinct Departments with Distinct Functions.

Defendants are corporate affiliates that provide various telecommunications services. *See* Declaration of James Beck ("Beck Decl."), ¶ 3. The services they provide, however, are significantly different and are provided by wholly separate groups of personnel. Pacific Bell Telephone Company ("Pacific Bell") provides wireline local telephone, digital television, and Internet services to residential, business, and government customers throughout much of the state of California. AT&T Corp. provides long-distance service to customers throughout the United States. *Id.* Although plaintiffs seek to lump these entities and their employees into a single undifferentiated group, a closer examination of the facts reveals that there is far more complexity and diversity than plaintiffs acknowledge.

At Pacific Bell, there are a number of technician positions that perform "outside" or "field" work, including, but not limited to: services technicians, outside plant technicians, antenna technicians, premises technicians, systems technicians and splicing technicians. Beck Decl., ¶ 4.[1] These technicians,

---

[1]   Most Pacific Bell technicians are represented by the Communications Workers of America

and the management organizations that supervise them, are grouped into three organizations based on work functions: Installation & Maintenance, Construction & Engineering, and U-verse.  *Id.*, ¶ 5.  Each organization has a separate management structure with its own dedicated field managers, area managers, directors, assistant vice presidents, and vice presidents.  *Id.*  The field managers in these organizations also have different job titles, job descriptions, and job duties.

At AT&T Corp., the outside technicians (all of whom hold the titles "Network Technical Specialist" or "Network Technical Specialist-G") and their managers are thinly spread over large geographies.  Because of the nature of its business, there are currently only *four* field managers employed by AT&T Corp. in California.[2]  Declaration of Carolyn Huffman ("Huffman Decl."), ¶ 4.  As set forth in further detail below, these managers, who hold the title "Manager Network Operations Center," are responsible for large swathes of territory and supervise AT&T Corp. technicians as well as oversee the work of third-party contractors.  *Id.*  These managers and technicians are part of a separate management structure that does not overlap with that of Pacific Bell's Installation & Maintenance, Construction & Engineering, or U-verse organizations.[3]

Here, plaintiffs attempt to portray all field managers from each of these organizations as a homogenous group.  As explained below, however, these wholly separate organizations perform clearly different services, which results in varied duties for both the technicians and their managers.

### 1.    Installation & Maintenance ("I&M").

The Installation & Maintenance ("I&M") organization is responsible for the initial installation and any subsequent maintenance of Pacific Bell's telephone, DSL, and other communication products.  I&M technicians service primarily residential customers and small businesses.  They travel directly to customer sites and conduct the majority of their work on the customers' premises.  The job requires technical knowledge and analytical skills, as well as the ability to work in all types of adverse conditions, including inclement weather and difficult terrain.  Beck Decl., ¶ 6.  The field managers in the

---

("CWA"), District 9, and subject to a collective-bargaining agreement.  Beck Decl., ¶ 4.

[2]    Indeed, there are fewer than ten individuals who worked as AT&T Corp. field managers in California during the alleged liability period.  Huffman Decl. ¶ 4.

[3]    AT&T Corp. technicians in California are also represented by the CWA, but covered by a different collective-bargaining agreement.  Huffman Decl., ¶ 5.

1  I&M organization hold the title "Manager Network Services," but often use informal titles as well (we

2  will call them "I&M Managers" here).  They supervise the installation and maintenance, provisioning,

3  dispatch and testing activities at customer sites for various product lines.  Beck Decl., ¶ 7, Exh. A.

4  I&M has several distinct sub-groups that perform specialized roles, in addition to the more

5  generalized teams that perform the basic installation and repair functions.  Some I&M Managers are

6  assigned designated teams of Special Services technicians.  These teams focus on the delivery of high-

7  end data-communications products such as T1s, T3s, and similar products.  They also conduct

8  specialized work, such as repairing high level circuits and maintaining 911 emergency dispatch systems.

9  Until 2009, Special Services I&M Managers reported up through a dedicated management structure

10  within the I&M organization.  They were subsequently reorganized on a geographic basis and now

11  report to the same area managers as other I&M Managers.  Beck Decl., ¶ 8.  Another group of

12  specialized I&M Managers is principally responsible for Cable Maintenance & Repair.  Cable

13  Maintenance & Repair teams maintain and repair wired-telephone and data transmission cables.  Cable

14  malfunctions or damage can result in the loss of service to a large number of customers.  As a result,

15  cable-maintenance work can be particularly urgent in nature and may require the dispatch and/or

16  reassignment of technicians at any time of day or night.  Although I&M Managers in this area ordinarily

17  do not have to go personally to the worksite to oversee overnight emergency repair situations, they are

18  involved in directing and assigning technicians to address these issues, as well as remotely monitoring

19  the progress of the work performed to ensure the restoration of service.  *Id.*, ¶ 9.  The vast majority of

20  plaintiffs' declarants (15 of 18 total) work in defendants' I&M organization.  *Id.*, ¶ 14.[4]  In addition, the

21  majority of the would-be opt-in plaintiffs (43 of 67) also work in the I&M organization.[5]  Indeed, 31 of

22  the 67 opt-ins report to only 2 of the 10 I&M Directors in California whose organizations include

23  outside technicians.  *Id.*, ¶ 15.

24  ///

25  _____

[4]  *See* Jenvey, H. Richardson, Seronello, Jiminez, Paddock, T. Richardson, Ramos, Stavert, Park,
26  Cathcart, Kimball, Lujan, Harrison, Wong, and Perez Declarations (Docket Nos. 35-5, 35-6, 35-8, 35-9,
35-10, 35-11, 35-12, 35-13, 35-14, 35-15, 35-16, 35-17, 35-18, 35-19, 35-20).

[5]  Because defendants cannot identify one of the would-be opt-in plaintiffs (Alan Davis), they do
27  not know if this individual worked for Pacific Bell or AT&T Corp., and, if so, in what job or
28  organization.

**2.      Construction & Engineering.**

The Construction & Engineering organization is responsible for executing long-term construction and engineering projects that entail the placement, rearrangement and removal of outside plant equipment to meet customer demands.  This includes the construction of telecommunications infrastructure in residential neighborhoods, as well as in and around commercial and government facilities.  The field manager position in Construction & Engineering that supervises outside technicians is Manager Construction & Engineering ("Construction Manager").  Construction Managers are responsible for the day-to-day supervision of construction activities and ensure that work processes conform to the construction project's master plan.  In addition to supervising technicians, Construction Managers may also supervise outside plant engineers or construction engineers, depending on the project. *See* Beck Decl., ¶ 10, Exh. B.

Construction & Engineering projects are designed and scheduled by the engineering group based on customer demands.  Construction Managers have fixed geographic scopes of responsibility and are responsible for any projects within that area.  Plaintiffs have presented only one declarant from Construction & Engineering.  Beck Decl., ¶ 14.[6]

**3.      U-verse.**

The U-verse organization is responsible for providing Pacific Bell's Internet television service to customers, including the installation and maintenance of that service.  It also provides certain high speed internet services and voice-over-Internet protocol services.  The U-verse organization, much like the U-verse television product itself, is relatively new; it was created in September 2006.  U-verse personnel are concentrated in those areas where Pacific Bell provides this service, currently the greater areas of San Francisco, Los Angeles, San Diego, and the Central Valley.  The U-verse field manager position that supervises outside technicians is formally titled "Manager Network Services," although it also may be called a variety of informal titles.  Beck Decl., ¶ 12, Exh. A.  Here, we call the position "U-verse Manager."  Notably, plaintiffs have not submitted any evidence regarding the U-verse Manager position, much less any proof that the position is similarly situated to field managers in the other organizations.

---

[6]      *See* Norton Declaration (Docket No. 35-7).

MEMO IN OPPTN. TO MTN FOR COND. CERT
U.S.D.C., N.D. Cal., No. C-09-5885-CRB

### 4.    AT&T Corp.

AT&T Corp. provides long-distance telephone service through wirelines, microwave transmission towers, and other methods.  The infrastructure that provides these services is maintained by technicians in the Network Technical Specialist and Network Technical Specialist-G job titles.   In California, much of this work is also performed by third-party contractors employed by various sourcing vendors.  Huffman Decl., ¶ 3.  The work of AT&T Corp. outside technicians is supervised by field managers in the Manager Network Operations Center ("Network Ops Managers") job title.   The Network Ops Managers develop procedures for the installation, rearrangement and changes of activity of network equipment.  They must also interface with third-party contractor vendors to coordinate work activities and to resolve any service-related issues.  *Id.*, ¶¶ 4, 8, Exh. A.  This interface, which is a key responsibility of the Network Ops Managers in California, involves dealing with any third-party organization that is engaged in construction or other work that may interfere with or damage company equipment—particularly buried long-distance lines.   Network Ops Managers are responsible for monitoring the work that may impact their operations, including supervising the technicians who physically mark buried lines and ensuring that the work of third-party contractors performing similar functions complies with company standards.  *Id.*, ¶ 8.

There are only four current Network Ops Managers employed by AT&T Corp. in California who supervise outside technicians.  Each is responsible for a large geographic territory, some of which extend into neighboring states.  Because of the large geographic territories they manage, the Network Ops Managers largely manage their technicians by telephone and only conduct periodic site visits.  Huffman Decl., ¶ 6.

Plaintiffs have submitted the declarations of two AT&T Network Ops Managers—Luque and Bradley, the only two AT&T Corp. employees who have opted into this lawsuit.  In all, there are fewer than ten putative class members who worked in that position in California during the liability period.

### B.    Defendants' Written Expectations for Field Managers Demonstrate That Plaintiffs' Claimed Work Experiences Are Not Consistent With Defendants' Intended Job Design.

In their motion, plaintiffs point to no evidence suggesting that defendants designed the field manager positions as non-exempt jobs.  On the contrary, plaintiffs allege merely that, *in practice*, the

jobs are non-exempt as they perform the jobs.  Yet, whatever plaintiffs say has been their experience, it is undisputed that defendants' written policies and training documents unambiguously demonstrate defendants' expectation that field managers should perform exempt managerial duties.

At great time and expense, defendants have developed a proprietary management model called Management System and Operating Control ("MSOC").  "MSOC is a system of management tools, methods, procedures and policies designed to provide a competitive advantage in how [defendants and their management personnel] manage [their] day-to-day business operations."  *See* Richardson Depo., 200:18-24, Exh. 8 at 3.[7]  The premise of the MSOC model "places a premium on managers spending time in the field in support of proactively improving the overall performance of [their] technicians, achieving [defendants'] business priorities and meeting [defendants'] core operational requirements."  *Id.*, 181:21-182:8, Exh. 6.   Plaintiffs admit that defendants have provided them with extensive training on the MSOC model, including multi-week classroom training.  *Id.*, 180:24-181:12; McElroy Depo., 176:18-177:4; Keselica Depo., 219:3-220:16; Maestri Depo., 110:1-111:3.

Through this training, defendants have expressly communicated their expectation that "the primary role of a [first-level] manager is to *coach and develop* their team to ever-increasing levels of performance" (Richardson Depo., 181:21-182:8, Exh. 6) (emphasis supplied); that field managers "must learn to harness [their] employees' skills, knowledge, and willingness to do a great job every day" (*id.*, 192:13-24, Exh. 7 at 4); that they "are responsible for *monitoring performance daily* and reacting to data received or observed" (*id.* at 5) (emphasis supplied); that they must "state clear direction, engage, inspire, and keep [their] employees focused" (*id.*, 200:18-24, Exh. 8 at 8); that they must "*provide the leadership* required to align their work group to the company goals and objectives" (*id.* at 9) (emphasis supplied); and that their responsibilities include "developing [their] employees, communicating effectively with [their] employees, and providing assistance by [among other things] planning and scheduling work on a daily basis and tracking progress throughout the day, conducting daily job huddles/tailgate sessions, ... *coaching* as necessary and documenting interactions, *encouraging employee engagement* and driving possible behavior, *setting expectations* and communicating results ..., *analyzing*

---

[7]     Deposition testimony is attached in alphabetical order to the Wohl Declaration filed with defendants' opposition.

*performance gaps* ..., identifying and solving operational problems and developing action plans to address problems and following up as needed. *Id.,* 203:5-7, Exh. 9 at 5 (emphasis supplied). Defendants have provided plaintiffs with training on how to manage and monitor employees' performance (*id.*, Exh. 7 at 4-5); how to modify poor or unsatisfactory performance (*id.* at 5-6), how to recognize employees' positive job performance (*id.* at 7), how to coach employees (*id.* at 13-14), how to mentor employees (*id.* at 17-18), and how to communicate goals to employees (*id.*, Exh. 8 at 9).

Moreover, defendants have unambiguously communicated their expectation that field managers are responsible for managing the crews of technicians assigned to them. For example, in a document distributed to plaintiffs entitled "AT&T Network Operations Manager's Guide to Non-management [*sic*] Employee Performance," defendants provided "guidelines ... to be used by managers as a tool to ensure consistent treatment" of I&M, C&E, and U-verse technicians. Knutson Depo., 208:13-17, Exh. 12 at 3; McElroy Depo., 214:11-17. In that document, defendants expressly stated their expectation that:

- *"Managers are responsible for coaching/developing all employees."*

- *"Managers must take time to document good performance as well as performance that needs improvement."*

- *"It is the manager's responsibility to set expectations, gather data and provide ongoing feedback to employees to assist them in utilizing their skills, ideas and expertise to produce results."*

- *"[T]he final decision regarding corrective action belongs to the field manager."*

- *"Managers are required to consistently monitor performance expectations in order to help employees be successful."*

*Id.*, Exh. 12 at 3-4 (emphases supplied). The document provides field managers with guidance on how to provide performance feedback to their technicians (*id.* at 7), how to recognize technicians for their good performance (*id.* at 9-10), how to prepare and implement Individual Action Plans ("IAPs") to improve technicians' performance (*id* at 13-14), and whether, how, and when to place technicians on a formal Performance Improvement Plan ("PIP") (*id.* at 14-15).

///

///

### C.     A Scientific Survey of 367 Field Managers Shows That Plaintiffs' Claimed Work Experiences Are Not Typical of Field Managers Generally.

In addition to defendants' written expectations reflecting the exempt design of the field manager positions, substantial evidence submitted with this opposition demonstrates that most field managers perform the management duties contemplated by defendants' written policies.  A recent scientific survey conducted on behalf of defendants interviewed 367 current and former field managers across California about their job duties and the types of decisions they must make in performing their job duties.  The survey, which was conducted by E. Deborah Jay, Ph.D., the C.E.O. of Field Research Group, one of the nation's most respected polling services,[8] demonstrates that most field managers are not subject to the strict control alleged by plaintiffs and instead regularly exercise discretion and independent judgment. The majority of respondents stated that:

- Since 2006, they have made suspension decisions or made recommendations to suspend a technician that are often or always followed (71%).

- They prepare written counseling, warnings, or discipline for their technicians (92%).

- They develop written performance improvement plans for technicians (65%).

- They provide verbal counseling to their technicians regarding their performance (97%), and the vast majority does so at least once a month (76%).

- They are responsible for evaluating their technicians' job performance (94%), including subjective factors such as skill (92%) and motivation (85%).

- They resolve disputes with the union, the CWA, prior to the filing of grievances (89%) and at the first step in the grievance process (77%).

- They determine their technicians' work assignments personally, or they "often" or "always" modify automated work assignments (71%).

- They provide training to the technicians that report to them (96%).

- They make decisions to approve unscheduled overtime for technicians (64%).

Jay Decl., ¶ 2, Exh. A at 2-3, 36-38.

---

[8]     Field Research Group, founded by Mervin Field, is perhaps best known for its widely-quoted political polling in California.

Moreover, roughly a third of respondents reported they were involved in termination decisions during the liability period.  Two-thirds of that group either made the decision to terminate or made a recommendation to terminate a technician's employment that was often or always followed.  *Id.* at 41-43.  In addition, the survey revealed that 80% of respondents spend more than half their time (i) analyzing and assessing prior day performance data; (ii) meeting with, coaching and counseling technicians and managing disciplinary issues; (iii) monitoring technician workload and assignments; (iv) training and instructing technicians on assignments; (v) observing and assessing technician performance; and (vi) investigating complaints.  *Id.* at 4. The survey results plainly demonstrate that plaintiffs' job experiences are not typical and certainly cannot be deemed representative of field managers across the state as a whole.

> **D.  Thirty Field Manager Declarations Presented by Defendants Show That Field Manager Work Experiences Differ Widely and Are Not Appropriate for Collective Treatment.**

The declarations of 30 field managers, filed concurrently with defendants' opposition, also demonstrate that the overall experiences of the field managers vary considerably from the plaintiffs and would-be opt-in plaintiffs for whom plaintiffs submitted declarations.  Although plaintiffs portray their job duties as being tightly constricted by company policy and procedure that deprives them of any ability to make decisions or use their discretion and independent judgment, these 30 declarations show that many field managers perform their job duties much differently.[9]

> **1.  Field Managers Make Decisions Regarding Discipline, Suspension and Termination or Recommendations That Are Given Particular Weight.**

Field managers in all four organizations are responsible for monitoring their technicians' performance, providing feedback, and taking appropriate corrective action when necessary.  AT&T Corp. Network Ops Managers are the only field managers who are responsible for monitoring contractor performance.  If a contractor is having performance issues, the Network Ops Manager must notify the vendor about the issue and recommend that the contractor be replaced.

---

[9]    Unlike plaintiffs' declarants, the declarations submitted by defendants represent a robust and varied group of witnesses, including fifteen I&M Managers, twelve Construction Managers, and three U-verse Managers.

Unlike plaintiffs, who contend they have little or no say in meting out discipline, the 30 declarations presented by defendants show that field managers make decisions and recommendations about discipline, suspensions, and terminations that are given particular weight.[10]  *See, e.g.*, Roldan Decl., ¶ 13 ("On these occasions, I gave my recommendation to my Area Manager and human resources that the technician should be terminated.  My recommendation was followed each time."); Dilbeck Decl., ¶ 18 ("I effectively persuaded my Area Manager and delivered the two week suspension").

In addition, there are differences in how and under what circumstances field managers administer discipline based on their individual managerial style.  For example, some field managers regularly consult with their area managers or the human resources department before taking disciplinary action.  Others make disciplinary decisions on their own and notify their area managers after the fact.  *Compare, e.g.*, Cushing Decl., ¶ 15 ("When I decide a suspension is necessary, I confer with human resources to ensure my punishments are consistent with those of my peers.") *with* Ayers Decl., ¶ 27 ("I prefer to consult with my Area Manager when I can before instituting discipline, but there is no rule that I do so.  I have taken immediate disciplinary action and notified my Area Manager after the fact.")  *See also* Arroyo Decl., ¶ 13; Cardona Decl., ¶ 15.

### 2.    Field Managers Exercise Discretion in Directing Work Assignments.

Plaintiffs contend that they exercise no discretion in assigning jobs to the technicians they supervise because all assignments are automated, but statements from the declarants show otherwise.  For example, work assignments in the Construction & Engineering organization are not automated at all because of the complex and long-term nature of the projects.  Rather, the design and engineering information is provided to the Construction Manager, who then must assess which technicians are available to work on the project and the relative priority of the project *vis-à-vis* other projects in his or her assigned area.  *See, e.g.,* Baer Decl., ¶ 6 ("I receive individual job requests along with a completion deadline.  It is then my responsibility to manage all of the jobs to ensure they are completed on time.  To

---

[10]    To the extent that multiple levels of management and/or human resources are involved in reviewing serious disciplinary actions, such as suspension or termination, it is to ensure that the actions taken are defensible within the context of the CBA governing non-management employees, as well as applicable law.  Beck Decl., ¶ 13.  Plaintiffs cannot seriously contend that the FLSA requires executive employees to have unfettered discretion to make these disciplinary decisions.

do this, I decide when my technicians will work on each job.  I also decide which of my technicians will work on which jobs.").  To manage effectively all of these projects, the Construction Managers must select particular technicians to work on each project, based upon their skill set, level of expertise and availability.  *Id.* ("I make these assignments based on my personal knowledge of my technicians' individual strengths and skills.").  Because multiple projects may have conflicting deadlines, the Construction Managers must monitor the progress on the various projects, and sometimes reassign technicians in order to finish the jobs on time.  *Id.*, ¶ 7 ("I rearrange the technicians' job assignments on a daily and hourly basis.").  *See also* Brennan Decl. ¶ 6; Day Decl. ¶ 5; Cudal Decl. ¶¶ 5-6.

In contrast, in the I&M organization, initial assignments for I&M technicians are generated by Pacific Bell's automated dispatch system because of the large volume of work assignments (also referred to as "tickets") that are produced by customer inquiries and internal network monitoring. Nonetheless, I&M Managers must rearrange these assignments throughout the work day based on a number of factors, including the level of expertise required for the job, the location of the job and the constantly changing availability of the technicians.  *See, e.g.,* Althof Decl., ¶ 8 ("If a particular job required special expertise, I could reassign the ticket to a more skilled technician or call the dispatch center and tell them who to reassign the ticket to."); Stone Decl., ¶ 6 ("… I constantly adjust and manipulate [the technicians'] schedules to ensure that all projects are covered.  A variety of factors could require me to rearrange assignments.  If the automated system is down, or if there is escalation of any sort, I manually assign work to techs.  I also have to manipulate work tickets around bad weather, stuck vehicles, and other unforeseen conditions that arise.  I use my judgment to determine which technicians to assign to which jobs, based on my knowledge of the tech's qualifications and current projects.").  *See also* Sturgill Decl., ¶ 6; Lybrand Decl., ¶ 6; Anderson Decl., ¶¶ 10-11.  In making these assignments, I&M Managers also must take into account the length of time a particular job will likely take and approve any potential overtime that will be required.  *See* Althof Decl., ¶ 10; Lewis Decl., ¶ 5.

Likewise, U-verse assignments are generated by Pacific Bell's automated dispatch system, but due to the complexity and variety of assignments, U-verse Managers are actively involved in assigning and reassigning projects based on the status of projects and the technicians' availability.  *See, e.g.*, Benkowsky Decl., ¶¶ 6, 7 ("The original schedules come from the centralized scheduling group, but I

1  decide whether to allow vacation days, swapped days, late arrivals, and early departures; "I reassign

2  work for various reasons.")  *See also* Fernandez Decl., ¶ 7.

3        The assignments for AT&T Corp. technicians in California have automated and manual aspects.

4  Daily work assignments are generated via an electronic dispatch system, and it is the responsibility of

5  the Network Ops Manager to monitor those assignments to ensure they are completed.  Huffman Decl.,

6  ¶ 8.  Network Ops Managers are responsible for reassigning projects if the assigned technician cannot

7  complete in a timely fashion for whatever reason (absence, conflicting workload, geographic

8  remoteness, lack of specific technical skills, *etc.*).  *Id*.  *Id*.  Network Ops Managers also manage their

9  technicians' workloads by deferring routine, non-urgent maintenance jobs until a later date in order to

10 avoid incurring additional overtime costs.  *Id*.

11                        **3.**      **Field Managers Provide Informal Training.**

12       Plaintiffs allege that they do not provide any training to the technicians they supervise, but their

13 extrapolation to other field managers is contradicted by the evidence.  Many field managers state they

14 provide training on a regular basis to the technicians they supervise.  The types and amounts of training

15 the first line managers provide vary based on their own personal experiences and managerial style.  *See,*

16 *e.g.,* Baer Decl., ¶ 9 ("Because of my long service as a splicing technician, I am able to assist my

17 technicians if I see them struggling in certain areas … I can recognize a technician's need for additional

18 training and coaching because I have spent a considerable amount of time in their position."); Dilbeck

19 Decl., ¶ 11 ("I frequently provide my technicians with informal training.  Because of my years of service

20 as a technician and a manager, I am comfortable teaching my technicians the correct or more efficient

21 way to complete a task.")

22                        **4.**      **Field Managers Resolve Grievances.**

23       The CBA provides technicians with a multi-stage grievance process for challenging decisions

24 made by the company and its managers, including decisions regarding individual discipline and certain

25 work practices.  The CBA encourages the company and the union to resolve disputes at the "lowest"

26 level, *i.e.,* in the field, prior to the filing of a grievance. Beck Decl., ¶ 4.  Once a grievance is filed, the

27 company's representative at the first stage (or step) of the process is the field manager.  If the grievance

28 is not resolved at this point, the union may appeal it to higher levels of management depending on the

nature of the dispute.  Although all Pacific Bell field managers must adhere to the CBA's grievance procedures, they have discretion to resolve employee grievances, often with limited upper-management involvement.  *See, e.g.*, Cushing Decl., ¶ 18 ("I have successfully resolved grievances at the first level.  During these meetings, I talk with the union steward to find a fair resolution.  My Area Manager does not come to these meetings."); Dilbeck Decl., ¶ 23 ("If I do receive a grievance, I sit down with the technician and union steward to determine the exact problem and to propose solutions.  My Area Manager has never been involved in these first level meetings.")

### 5.  Field Managers Evaluate Performance with Subjective and Objective Factors.

All field managers are responsible for monitoring and evaluating their technicians' performance.  Depending on the organization and specialty areas within each organization, field managers are responsible for supervising a team ranging from approximately ten to thirty technicians.  *See, e.g.*, Ayers Decl., ¶ 3 (supervises 9 splicing technicians), Stone Decl., ¶ 3 (supervises 29 technicians).  Given the variation in the size of technician teams, field managers monitor and evaluate their technicians in different ways.  For example, some field managers review their technicians' performance more frequently than other managers.  *See, e.g.*, Ayers Decl., ¶ 18 ("I perform quality observations of my techs 2 to 3 times a week."), Dilbeck Decl., ¶12 ("I complete performance reviews of my technicians annually, but I also complete smaller reviews on a monthly basis.").

Like many businesses, defendants measure certain objective performance metrics to assess a technician's performance.  But contrary to plaintiffs' assertions, field managers also use subjective factors in tailoring their evaluations.  As one declarant explains:  "I do not evaluate my technicians using only their numbers in these categories.  If I was new to this job and did not know my technicians personally, I would need to put more reliance on the numbers.  Because I have known my technicians for 15 years, however, I know their capabilities and work ethic, as well as the obstacles they are likely to face.  I use all of this to evaluate their performance."  Cushing Decl., ¶ 10.

In addition, although low performance numbers can lead to placing a technician on a performance improvement plan, field managers can choose to submit waiver forms if there are other factors that should be taken into consideration when evaluating the technician's overall performance.  *See, e.g.*, Baer Decl., ¶ 12 ("If I do not believe the numbers tell the whole story, I can submit a waiver

[from a performance improvement plan] to my Area Manager explaining the situation. I request waivers for my technicians approximately once per month, and I have never had one denied.")

## III. THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR CONDITIONAL CLASS CERTIFICATION UNDER THE FLSA

### A. To Win Certification, Plaintiffs Must Show They Are Similarly Situated to the Class They Seek to Represent.

The collective action procedure under the Fair Labor Standards Act ("FLSA") is available only where the employees in the proposed group are "similarly situated" to one another. 29 U.S.C. § 216(b). Neither the Supreme Court nor the Ninth Circuit Court of Appeals has defined the phrase "similarly situated." Accordingly, the Court should look to the purposes of the collective action procedure and its legislative history to evaluate plaintiffs' motion.

The collective class action procedure exists to facilitate the "efficient resolution ... of [material] common issues of law and fact." *Hoffman-La Roche, Inc. v. Sperling,* 493 U.S. 165, 170 (1989). In other words, collective treatment may be appropriate when a comparatively small number of witnesses can testify and provide representative proof about the day-to-day duties and responsibilities of a larger group of employees allegedly misclassified by their employer. In theory, where there is homogeneity among class members, the fact-finder can determine, based on the testimony of the representative employees, whether the group as a whole is entitled to compensation, without hearing from each member of the collective class. If, however, the day-to-day work duties of those in the putative class are materially *different* in ways relevant to the exemption question, the "collective action" process is unsustainable. *See Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Ore. 2002) ("an action dominated by issues particular to individual plaintiffs cannot be administered efficiently because individual issues predominate over collective concerns"); *Aguirre v. SBC Commc'ns, Inc.*, Civ. A. No. H-05-3198, 2007 WL 772756, at *14 (S.D. Tex. Mar. 12, 2007) ("In cases with ... variability among the members of the putative class of allegedly misclassified employees, courts have refused to certify the case for collective treatment because an individual inquiry into each plaintiff's job duties is required."); *McElmurry v. U.S. Bank Nat'l Ass'n,* No. CV-04-642-HU, 2005 WL 2078302, at *18 (D. Ore. July 29, 2005) ("factual differences may undermine the judicial efficiency which a collective action is designed to promote"). Accordingly, authority to issue notice in the first instance is left to the discretion of the district court

1  with the caution from the Supreme Court that this discretion should be exercised only in "appropriate

2  cases." *Hoffman-La Roche, Inc.*, 493 U.S. at 169.

3  Although the initial "similarly situated" inquiry is lenient, the standard "is not a mere formality."

4  *See, e.g.*, *Austin v. CUNA Mut. Ins. Soc'y*, 232 F.R.D. 601, 605-06 (W.D. Wis. 2006); *see also Pacheco*

5  *v. Boar's Head Provisions Co.*, 671 F.Supp.2d 957, 960 (W.D. Mich. 2009) (noting that court has "a

6  responsibility to assure that there is some factual basis for plaintiffs' claims of class-wide discrimination

7  before judicial approval of the sending of notice is granted") (internal quotations and citations omitted);

8  *Bishop v. Petro-Chem. Transport, LLC*, 582 F.Supp.2d 1290, 1296 (E.D. Cal. 2008) ("While the

9  standard for conditional approval at [this] stage of the litigation is lenient, it does require *some*

10  *evidentiary* support.") (emphasis in original); *Lima v. Int'l Catastrophe Solutions, Inc.*, 493 F. Supp. 2d

11  793, 798 (E.D. La. 2007) (stating that while "standard at this stage is 'not particularly stringent' ... it is

12  by no means automatic.") (internal citations omitted).

13  An evidentiary basis for a "modest showing" that potential opt-ins are "similarly situated" is

14  essential to remain true to Congress's intent in adopting the reform Portal to Portal Act of 1947. The

15  "similarly situated" language of the FLSA was part of the original 1938 Act, which broadly permitted

16  representative and collective actions for a variety of wage-and-hour practices. The substantive

17  provisions of the Act, as interpreted by the Supreme Court, led to a flood of litigation and "unexpected

18  liabilities, immense in amount and retroactive in operation" for employers. Portal to Portal Act of 1947,

19  29 U.S.C. § 251(a), § 1(a). "Perceiving the flood of litigation as a serious threat to interstate commerce

20  the Congress *moved to limit* … the class action procedures for filing [collective] actions" by adding the

21  FLSA's opt-in procedure via the adoption of the Portal to Portal Act in 1947. *Dolan v. Project Constr.*

22  *Corp.*, 725 F.2d 1263, 1266-67 (10th Cir. 1984) (emphasis added), *overruled in part by Hoffmann-La*

23  *Roche*, 493 U.S. 165 (1989). In doing so, Congress specifically sought to address the 'tremendous

24  financial burden" placed upon employers from the "excessive and needless [collective action] litigation"

25  the Act had spawned. 29 U.S.C. § 251(a)(7); *see* H.R. Rep. No. 71 (1947), *reprinted in* 1947 U.S. Code

26  Cong. & Admin. News 1029, 1032.

27  More specifically, in an alleged exempt misclassification collective action, the "similarly

28  situated" question "must be analyzed in terms of the nature of the job duties *performed by each class*

*member*, as the ultimate issue to be determined is whether each employee was properly classified as exempt." *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) (emphasis supplied); *King v. West Corp.*, No. 8:04CV318, 2006 WL 118577, at *14 (D. Neb. Jan. 13, 2006) ("Since the ultimate issue to be determined in this case is whether West properly classified [the employees] as exempt, deciding whether members of this proposed class are 'similarly situated' requires analyzing the nature of the job duties performed by each putative plaintiff.")  When there are disparities among the employees' day-to-day duties, "[t]o determine which employees are entitled to overtime compensation[,] … [the fact-finder must undertake] an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria." *Morisky* at 498.

Thus, given the individualized inquiry that is required to determine exempt status, courts do not accept "mere allegations" that a plaintiff is similarly situated without supporting evidence.  *See*, *e.g.*, *Pfaahler v. Consultants for Architects, Inc.*, No. 99-C-6700, 2000 U.S. Dist. LEXIS 1772, at *6 (N.D. Ill. Feb. 8, 2000) (insufficient evidence where plaintiff had no personal knowledge of "the work other [putative class members] performed, the circumstances under which work was performed, or the circumstances of potential claimants"); *Donihoo v. Dallas Airmotive, Inc.*, No. 3:97-CV-0109-P, 1998 U.S. Dist. LEXIS 2318, at *4-5 (N.D. Tex. Feb. 20, 1998) (no evidence that plaintiff was similarly situated to every salaried employee at company; "an inquiry into the employee's specific job duties ... is not appropriate in a class lawsuit under Section 216(b)").  Where, as here, the party opposing conditional certification presents evidence refuting or undermining the plaintiffs' claims, district courts conduct a more thorough examination of the plaintiffs' allegations.  *See*, *e.g.*, *Pacheco*, 671 F. Supp. 2d at 960 ("It would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated.") (quoting *Freeman v. Wal-Mart Stores*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003)); *Forney v. TTX Co.*, No. Civ. A. 05 C 6257, 2006 WL 1030194, at *3 (N.D. Ill. Apr. 17, 2006) (denying plaintiff's motion for conditional certification, even under "lenient" standard, because she failed to prove other employees were similarly situated); *Woods v. New York Life Ins. Co.*, 686 F.2d 578, 581 (7th Cir. 1982) (acknowledging that discovery demands upon conditional certification may impose "a tremendous financial burden to the employer").

**B.      Conditional Certification of the Executive or Administrative Exemption Necessarily Turns on Individual Assessments and Complex Factual Determinations.**

Analysis of an employee's exempt or non-exempt status under the executive or administrative exemption (the exemptions applicable to field managers here) is a highly fact-intensive inquiry.  Yet the purpose behind a collective action is to promote judicial efficiency by allowing common issues to be tried together.  *Hoffmann-LaRoche*, 493 U.S. at 170; *Sheffield*, 211 F.R.D. at 415-16.  For this reason, where the very nature of the inquiry requires detailed individual fact-finding on a claimant-by-claimant or job-by-job basis, such economies are lacking, and a collective action proves unwieldy.  *Sheffield*, 211 F.R.D. at 413 ("[A]n action dominated by issues particular to individual plaintiffs can not be administered efficiently because individual issues predominate over collective concerns."); *McElmurry*, 2005 WL 2078302, at *18 ("factual differences may undermine the judicial efficiency which a collective action is designed to promote").

An employee "employed in a bona fide executive capacity" is properly classified as exempt.  29 U.S.C. § 213(a)(1).  An employee qualifies for the executive exemption when the employee: (1) is compensated on a salary basis at a rate of not less than $455 per week; (2) has as his or her primary duty management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) customarily and regularly directs the work of two or more other employees; and (4) has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.  29 C.F.R. § 541.100(a).

The regulations provide a lengthy, non-exhaustive list of managerial activities to consider when analyzing whether an employee's primary duty is "management" within the meaning of the statute.[11]

---

[11]      Generally, "management" duties include, but are not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting employees' rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.  29 C.F.R. § 102.

1    For those activities to constitute an employee's "primary duty," they must be "the principal, main, major

2    or most important duty that the employee performs." 29 C.F.R. § 700.  Determination of an employee's

3    "primary duty" requires a fact-based investigation into an employee's job.  Factors to consider when

4    determining the primary duty of an employee under the executive exemption include, but are not limited

5    to, "the relative importance of the exempt duties as compared with other types of duties; the amount of

6    time spent performing exempt work; the employee's relative freedom from direct supervision; and the

7    relationship between the employee's salary and the wages paid to other employees for the kind of

8    nonexempt work performed by the employee." *Id.*, § 102.  Given the multifaceted nature of this inquiry,

9    "the assessment of whether an employee falls into the executive exception is an *individual and fact-*

10   *intensive* inquiry and necessitates a careful factual analysis of the full range of the employee's job duties

11   and responsibilities."  *Hernandez v. United Auto Credit Corp.*, No. C-08-03404 RMW, 2010 WL

12   1337702, at *3 (N.D. Cal. Apr. 2, 2010) (emphasis added).

13          Likewise, determining whether an employee qualifies as exempt under the administrative

14   exemption also requires an individualized analysis of an employee's duties.  An employee qualifies for

15   the administrative exemption if the employee's "primary duties" involve "the performance of office or

16   non-manual work directly related to the management or general business operations of the employer or

17   the employer's customers," and "include[ ] the exercise of discretion and independent judgment with

18   respect to matters of significance."  29 C.F.R. § 541.200(a)(2) & (3).  Here too, the regulations provide a

19   long list of non-exhaustive factors to consider in determining whether work involves discretion and

20   independent judgment.  *Id.*, § 541.202(b).  Accordingly, an examination of whether an employee

21   qualifies as administratively exempt requires several factual determinations: (1) an appraisal of the

22   employee's primary duties; (2) a judgment of whether such duties require the "performance of office or

23   non-manual work directly related to the management or general business operations;" (3) a more

24   complex analysis of whether the employee exercises discretion and independent judgment; and (4) if the

25   discretion and independent judgment exercised is "with respect to matters of significance."  *Id.*,

26   § 541.200.  Like the executive exemption, this complex, multi-step determination of an employee's

27   administratively exempt status is "necessarily fact intensive."  *See, e.g.*, *Cooke v. Gen. Dynamics Corp.*,

28   993 F. Supp. 56, 58-62 (D. Conn. 1997) (analysis of administrative exemption is "necessarily fact

intensive," "turn[ing] on a careful factual analysis of the full range of the employee's job duties and responsibilities."); *Aguirre*, 2007 WL 772756, at *10 (to determine if employees are similarly situated, court must consider "kind of duties they had, the amount of time they spent on these duties, and the extent of the discretion they exercised").

Cases where the day-to-day duties of a group of employees vary significantly, such as the case here, are generally not appropriate for collective certification. *See Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220-21 (D. Conn. 2003) (denying conditional certification because "proof in this [misclassification] case is specific to the individual," and, "[r]egardless of the possibility that another employee's primary duties were [the same], any other plaintiff would also have to present specific evidence of his or her daily tasks, and the court would have to apply the regulations on an individual basis."); *King*, 2006 WL 118577, at *14 (denying conditional certification because the determination of whether employees were properly classified as exempt required "an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria").

### C.   Plaintiffs Have Not Met Their Burden of Proving They Are Similarly Situated to the Proposed Class.

#### 1.   Plaintiffs' Proposed Class Includes Disparate Field Manager Positions That Are Not the Same in Terms of Their Organizational Responsibilities.

Plaintiffs seek to represent a class made up of field managers working in the Pacific Bell I&M, Construction & Engineering, and U-verse and AT&T Corp. organizations (even though, as explained above, plaintiffs have failed to offer any evidence with respect to the field manager position in U-verse, and virtually none regarding Construction & Engineering).  To assess whether the field manager position is properly classified as exempt in each of these organizations, the Court would have to look at each position separately.  For example, the exempt status of I&M Managers, who are responsible for the day-to-day installation and repair of telephone, DSL, and other products for residential and small business customers, would have to be considered separately from the exempt status of Construction Managers, who are responsible for the execution of long-term construction projects involving the placement, rearrangement or removal of outside plant equipment facilities.  In addition, Construction Managers typically supervise technicians who work on long-term projects that are staffed at the discretion of the field manager in order to accommodate various customer-driven completion deadlines.

1   *See, e.g.*, Baer Decl., ¶ 6 ("I … manage all of the jobs and ensure they are all completed on time.  To do
2   this, I decide when my technicians will work on each job.  I also decide which of my technicians will
3   work on which jobs.").  In contrast, I&M Managers supervise technicians who handle *ad hoc* customer
4   requests, urgent repairs and increased priority tickets.  *See, e.g.,* Dilbeck Decl., ¶ 8 (directing
5   technicians' work at high-priority customers, such as prisons, hospitals or county buildings).  Because of
6   the high volume and urgent nature of these requests, I&M tickets are distributed through an automated
7   dispatch system that is then subject to revision by the field manager based on relevant factors unique to
8   the particular job, including technician skill, availability, and location.  *See*, *e.g.*, Gladney Decl., ¶¶ 5-7
9   (reassigning work if technician is "geographically closer" to work site and because "[d]ispatch does not
10  always understand the specialties in which my technicians have been trained, and they sometimes assign
11  a particular type of specialized work to one of my technicians who does not have the expertise to do the
12  work.")  Accordingly, Construction Managers and I&M Managers necessarily have different work
13  experiences based on the nature and logistics of the types of projects they manage.

14          Further, there are variations among job duties *within* each of these organizations and even among
15  the plaintiffs and their declarants themselves.  Consequently, the Court would also be compelled to
16  examine the actual tasks performed by each individual in each organization.  *Compare, e.g.*, Norton
17  Decl., ¶¶ 27, 36 (Docket No. 35-7) ("I do not have the authority to assign discipline to my technicians.";
18  "I can order minor tools….[b]ut to order anything of value, even a ladder, I must get approval from my
19  Level Two [manager]."), *with* Cushing Decl., ¶¶ 8, 15 ("I have authority to approve or deny all purchase
20  orders submitted by my technicians for tools and equipment.";  "I have suspended technicians on
21  numerous occasions, usually for attendance issues.  Our attendance policy leaves these disciplinary
22  decisions up to the Construction Manager's discretion.").  Indeed, as discussed above, the deposition
23  testimony demonstrates that significant differences exist even among the named plaintiffs.  Among other
24  differences, Luque contends that he never made any recommendations regarding technician discipline,
25  while Richardson admits that he made recommendations regarding suspension and/or termination of
26  several technicians and that those recommendations were followed on all but one occasion that he could
27  recall.  (*Compare* Luque Depo., 114:21-115:1 *with* Richardson Depo., 222:24-225:1, 235:6-14, 258:4-
28  25, 266:9-267:1, 313:16-316:20).  Given these differences, the Court cannot fairly extrapolate the

1    claimed experiences of plaintiffs and their 18 declarants to all field managers in California to meet the
2    "similarly situated" requirement to conditionally certify a class.

3          At bottom, plaintiffs' motion for conditional class certification, if granted, will force the Court
4    and the parties to adjudicate the claims of dissimilar employees, thus substantially reducing the primary
5    benefit of class action proceedings—the judicial economy produced by the "efficient resolution in one
6    proceeding of common issues of law and fact." *Hoffmann-La Roche,* 493 U.S. at 170.  Instead of
7    reaping economies of scale from conditional certification of a collective action, the Court will be
8    burdened with the task of parsing through the job duties of individual employees who work in four
9    distinct organizations with separate management structures, who are not similarly situated.

10                    **2.     The Field Research Survey Convincingly Proves That Plaintiffs Are Not**
                             **Similarly Situated to Field Managers in General.**
11

12         Field Research Group's scientific survey of 367 current and former field managers convincingly
13   demonstrates that plaintiffs and their declarants are not similarly situated to other field managers across
14   the state.  The majority of survey respondents stated that they determine their technicians' work
15   assignments (71%); decide whether to approve unscheduled overtime (64%); order tools or equipment
16   for themselves or their technicians (94%); provide technician training (96%); evaluate technicians'
17   performance (94%); develop written performance improvement plans (65%); decide to suspend a
18   technician (71%); resolve customer complaints (65%); and informally resolve disputes before a
19   grievance is filed (89%) or at the first level grievance process (77%).  Jay Decl., ¶ 2, Exh. A at 2-3.

20         Further, although plaintiffs make much ado about the fact that they were not involved in
21   termination decisions, terminations of technicians—many of whom have 20 or more years of
22   service—are a relatively rare event.  Beck Decl., ¶ 13.  Nevertheless, even though such terminations
23   occur infrequently, roughly a third of survey respondents reported they had been involved in termination
24   decisions during the alleged liability period.  And, of those respondents who were involved in
25   terminations, their recommendations to terminate a technician's employment were often or always
26   followed two-thirds of the time.  Jay Decl., ¶ 2, Exh. A at 42-44.

27         Plaintiffs also make sweeping claims that they had no involvement in assigning work to
28   technicians,  performed  only  rote  safety  checks  and  performance  evaluations,  and  made

recommendations regarding personnel actions that were never, or rarely, followed.   But the overwhelming majority of field managers across the state describe having very different work experiences.[12]   They manage their teams independently, with some interaction with their area managers, and use their judgment in a variety of ways, whether it be rearranging work assignments to meet customer needs to administering discipline, up to and including participating in termination decisions.   Given this overwhelming evidence, plaintiffs cannot credibly claim they are similarly situated to field managers in all four Pacific Bell and AT&T Corp. organizations throughout California.   *See, e.g.,* *Hinojos v. Home Depot, Inc.,* No. 2:06-CV-00108, 2006 U.S. Dist. LEXIS 95434, at *6 (D. Nev. Dec. 1, 2006) (denying conditional certification, in part, because "survey of defendant's current and former ... employees belies the existence of any common practice tying plaintiffs with other ... employees").   They thus cannot meet the requirement of showing they are "similarly situated" to the class they propose.

### 3.   Plaintiffs' Eighteen Declarations Have No Probative Value with Respect to Other Field Managers.

The declarations of eighteen field managers submitted by plaintiffs do not show how other field managers performed their jobs.   To be sure, thirteen of these declarants purport to speak on behalf of "Other Level One Managers," and contend that many, if not all, field managers in the entire state of California are similarly situated to each other.   But these sweeping and conclusory statements are not supported by any personal knowledge or predicate facts.   The declarants have not demonstrated that they have personal knowledge of the work performed by other field managers, let alone field managers statewide.   Indeed, most of the declarants claiming to speak on behalf of other field managers work in concentrated supervisory chains in a single organization—I&M—and even within that organization, most work in a single concentrated geographic area—the Bay Area.   Beck Decl., ¶ 15.   They have no

---

[12]      Appendices D-I of Dr. Jay's report provide the survey respondents' *verbatim* responses to several open-ended questions; they provide a flavor of the various ways field managers perform their jobs in comparison to plaintiffs.   For example, with respect to training, one respondent reported:  "I deal with special training.   I deal with hi-cap training, fiber MUXes, and 911 training.   Just all the high-end products we have, and other special products services."  *See* Jay Decl. Exh. A, App. E at 4 (ID No. 0064).   Another respondent reported conducting training on "Anything—you name it and the field supervisors, we are the ones that are told to do it.   Nobody else does any training, expect for anything outside like CPR."  *Id.* at 10 (ID No. 0169).  *Compare* Jimenez Decl., ¶ 22 (Docket No. 35-9) ("I do not train the technicians that I work with.   Training is typically done technician-to-technician, on the job.")

factual basis to make statements about other field managers who work under different supervisors, in different organizations, and in other geographic areas of the state.   Moreover, plaintiffs have failed to submit even one declaration from a field manager in the U-verse organization, and have submitted only a single declaration from a manager in the Construction & Engineering organization.  Yet plaintiffs seek to certify a class of hundreds of field managers from all four organizations (I&M, Construction & Engineering, U-verse and AT&T Corp.).  They therefore lack the required evidence that all of these field managers are "similarly situated" within the meaning of the FLSA.

Courts agree that anchorless, conclusory declarations of this kind do not suffice to show similarity.  *White v. MPW Indus. Servs. Inc.*, 236 F.R.D. 363 (E.D. Tenn. 2006), is particularly instructive.   The court there issued notice, but only after holding the plaintiff to an appropriate evidentiary standard: *"affidavits submitted at the notice stage must be based on the personal knowledge of the affiant*.  If the Court were to conclude otherwise, affidavits submitted would not be any more probative than the bare allegations in the complaint, and the requirement of factual support would be superfluous."  *Id.* at 369 (emphasis added).  *See also O'Donnell v. Robert Half Int'l, Inc.*, 429 F. Supp. 2d 246, 250 (D. Mass. 2006) ("affidavits [were offered by] the individual plaintiffs, [but] neither of [them] has personal knowledge of the practices ... in other divisions or offices"); *Barfield v. New York City Health & Hosps. Corp.*, No. 05 CIV. 6319 (JSR), 2005 U.S. Dist. LEXIS 28884, at *3 (S.D.N.Y. Nov. 17, 2005) (plaintiff failed to make even "modest factual showing" because he presented "nothing but limited anecdotal hearsay"); *De La Cruz v. El Paso County Water Improvement Dist. No. 1*, No. EP-05-CV-206-FM, 2005 U.S. Dist. LEXIS 21244, at *7 (W.D. Tex. Sept. 19, 2005) ("Plaintiffs produce only conclusory statements that do not even meet a 'modest factual showing.'")

### 4.   The Deposition Testimony of Plaintiffs, Opt-ins, and Other Declarants Also Show That Plaintiffs' Claims Are Not Appropriate for Collective Treatment.

In addition to the survey, field manager declarations, and written job expectations submitted by defendants, depositions of the named plaintiffs, opt-ins, and other declarants corroborate in material part defendants' showing of the exempt nature of the field manager positions.  At minimum, the depositions show that plaintiffs are not similarly situated to the large and diverse putative class they seek to represent, and therefore their claims are not appropriate for collective treatment.  Indeed, this evidence

shows abundant credibility conflicts that can be resolved only through individualized adjudications.

### a. The Depositions Show That Field Managers Regularly Perform a Number of Exempt Managerial Duties.

Despite plaintiffs' protestations that they are merely clerical employees who pass along information without any meaningful managerial responsibilities, the depositions show that field managers in fact *do* perform day-to-day responsibilities that are consistent with exempt executive work:

- Field managers review daily reports reflecting their crew's performance on various metrics and investigate the reasons for any low scores by speaking with technicians. Keselica Depo., 52:7-57:7; Park Depo., 29:9-24, 32:10-33:12.[13]

- Field managers provide technicians with positive recognition to acknowledge good work and approve "game plans" for technicians who need to improve their performance. Richardson Depo., 196:17-197:15, 213:17-214:3, 227:8-25; Knutson Depo., 198:16-20, 199:7-13; McElroy Depo., 190:24-191:16; Keselica Depo., 98:14-25; Park Depo., 117:2-13, 118:17-119:4.

- Field managers prepare yearly performance evaluations of their technicians that include both objective and subjective assessments. Richardson Depo., 225:2-235:14, Exh. 15-16; Knutson Depo., 218:13-219:25, Exh. 87; Keselica Depo., 79:13-80:21; Jenvey Depo., 230:22-231:10, Exh. 76; Park Depo., 168:17-172:9, Exh. 133.

- Field managers represent defendants in union grievances filed by technicians. Richardson Depo., 278:19-279:6; Luque Depo., 256:18-258:18; Knutson Depo., 76:20-77:1, 291:22-294:14; Park Depo., 274:4-14, 277:8-25.

- Field managers perform quality and safety observations regarding their technicians, discuss the results with the technicians, and document those results. Knutson Depo.,

---

[13]     In his deposition, Keselica denied that the process of asking technicians about the possible reasons for unsatisfactory performance scores constitutes "investigating" because "the police department investigates crimes ... [and] [t]hese technicians are not committing crimes." Keselica Depo., 53:5-24. Semantics aside, Keselica admits that performance reports generated for his crew provide only a percentage, that the reports themselves do not indicate why a percentage may be high or low on a particular day, that the only way that one can explain a particular score is by speaking with the technicians. *Id.*, 56:1-57:2, 113:8-115:6.

170:21-171:2; McElroy Depo., 170:19-173:21; Keselica Depo., 78:10-79:13; Park Depo., 39:23-41:2.

- Field managers approve technicians' requests to work unscheduled overtime.   Luque Depo., 202:3-21, Exh. 44; Luque Depo., 305:6-306:4; Knutson Depo., 155:9-157:22; McElroy Depo., 147:25-149:12.

- Field managers review and approve technicians' time reports reflecting their work hours for each week.   Seronello Depo., 165:25-168:2; Richardson Depo., 162:20-163:24; Knutson Depo., 152:9-153:12; Keselica Depo., 252:17-253:20; Norton Depo., 80:15-20; Park Depo. 84:18-85:8.

- Field managers monitor technicians' work assignments to make sure that the technicians are completing the jobs on time and communicate with defendants' dispatch centers to adjust technicians' work schedules when, in their view, technicians make a reasonable request for a change or when a change is needed because of the complexity of a job or the skill-level of a technician.   Richardson Depo., 100:7-101:5; Knutson Depo., 65:6-22; Jenvey Depo., 44:2-46:7; Seronello Depo., 54:9-55:13, 57:3-6; Keselica Depo., 77:23-78:2; Park Depo., 36:24-39:22.

- Field managers make—and their area managers approve—recommendations to permit technicians to take vacation days when the technicians otherwise would not be permitted to do so.  Richardson Depo., 96:23-98:19.

- Field managers investigate, handle, and/or resolve customer complaints, including billing disputes related to the work of their technicians.   Richardson Depo., 111:11-112:15; Keselica Depo., 135:11-19, 349:2-349:16, 350:9-352:16; Knutson Depo., 32:12-34:16, 223:6-227:3; Seronello Depo., 63:15-18.

- Field managers investigate motor vehicle accidents involving technicians and prepare "accident investigation" reports in which they are required to identify the "root cause" of such accidents.  Luque Depo., 247:14-252:18, Exhs. 53, 54; Knutson Depo., 75:22-76:1; Keselica Depo., 92:9-97:13, 357:10-368:21, Exh. 314, 315; Jenvey Depo., 265:23-273:3.

- Field managers investigate EEO, disability, and/or workers compensation claims initiated

by their technicians.  Luque Depo., 356:1-360:9; Keselica Depo., 354:24-356:20.

▪   Field managers authorize company expenditures for technicians, such as expenditures for tools, Knutson Depo., 158:5-159:7, or meals for technicians, Luque Depo., 216:19-219:24, Exh. 47.

### b. To the Extent the Deponents Claim They Are Mere Clerks Collecting and Passing Along Information, They Are Not Performing to Their Area Managers' Expectations.

The claim by many deponents that they did little more than gather and convey information also is inconsistent with defendants' documented expectations and directions.

Almost all of the deponents admitted that defendants provided them with extensive training on defendant's "MSOC" management model.  *See, e.g.,* Richardson Depo., 180:24-181:12; McElroy Depo., 176:18-177:4; Keselica Depo., 219:3-12; Maestri Depo., 109:14-110:2; Norton Depo., 104:17-105:2; Knutson Depo., 182:20-183:18; Caffrey Depo., 96:8-17, 183:11-184:12; Park Depo., 107:25-108:18; Jenvey 135:16-136:12.  The deponents understood that defendants considered such training on the MSOC model to be very important, as such training lasted for several weeks and pulled them away from other responsibilities.  *See* Keselica Depo., 219:3-220:16; Maestri Depo., 110:1-111:3.  Although defendants' MSOC model contemplates that exercising leadership of the work group is an expected part of the field manager positions (Knutson Depo., 202:10-203:21, Exh. 8), deponents readily admitted that a portrayal of the field manager positions as merely clerical is inconsistent with the MSOC model and defendants' other written expectations.  *See, e.g.,* Richardson Depo., 194:13-195:19 (Richardson does not perform his job per MSOC training he received because he has not "really got the hang of doing it").

Moreover, the deponents' depiction of themselves as information clerks is contrary to the expectations of their area managers that field managers actively coach, develop, and mentor their technicians, which repeatedly have been communicated to field managers.  *See, e.g.,* Huffman Decl., ¶ 7; Williamson Decl., ¶ 4; Graham Decl., ¶ 4; Jenkins Decl., ¶ 4.  The deponents' area managers expect field managers to provide their technicians with informal on-the-job training.  *See, e.g.,* Williamson Decl., ¶ 5; Jenkins Decl., ¶ 4.  They expect field managers to apply their subjective judgment when preparing technician performance evaluations and not to focus solely on numerical performance metrics. *See, e.g.,* Williamson Decl., ¶ 8.  They expect field managers to analyze performance metrics in order to

determine why the performance of technicians may be unsatisfactory and to develop strategies to help such technicians improve their performance.  *See, e.g.,* Graham Decl., ¶ 5; Williamson Decl., ¶ 6.  They expect field managers to exercise discretion in requesting waivers for technicians in situations where performance improvement plans may not be warranted and to be actively involved in developing performance improvement plans in situations where they are warranted.  *See, e.g.,* Graham Decl., ¶ 5.  They expect field managers to monitor technicians' workloads and recommend modifications to technician work assignments as appropriate.  *See, e.g.,* Williamson Decl. ¶ 7.  They expect field managers to use their judgment when investigating motor vehicle or safety accidents and not merely to recite information provided to them by technicians.  *See, e.g., id.* ¶ 11.  Moreover, they expect field managers to recommend suspensions, warnings, or other discipline of technicians as warranted and to exercise judgment to ensure that adequate documentation exists to support such corrective action.  *See, e.g.,* Graham Decl., ¶ 9; Williamson Decl., ¶ 10.

None of these expectations was kept secret.  On the contrary, the deponents' area managers communicated these expectations to them in their annual performance evaluations, often crediting them with performing duties that plaintiffs now deny ever having performed.  For example, in area manager Jenkins's 2007 performance evaluation for Richardson, Jenkins credited Richardson as having "managed an average of 21 [technicians]" and noted that his career goals for 2008 involved "committing to coach each tech individually."  Richardson Depo., 291:6-292-293:10, Ex. 30; Jenkins Decl., ¶ 11.  Although Richardson alleges that he "spend[s] most of [his] time doing clerical work," that testimony is inconsistent with Jenkins' expectations of first-level managers and her assessment of Richardson's job performance.  Jenkins Decl., ¶ 11.

Similarly, in area manager Graham's 2009 performance evaluation for Maestri, Graham credited Maestri for making "progress in team results through ongoing Training, Performance Management, and utilization of the tools provided during MSOC deployment," and for "doing all the rights things to move his team out of the bottom 10%," noting that he "has 4 of his crew members on the proper step of a Performance Improvement Plan" and that he was "the first manager to terminate an employee [technician Elvan Rowe] based on performance."  Maestri Depo., 112:7-12, Exh. 317; Graham Decl., ¶¶ 11-12.  Although Maestri now denies that he deserved any such credit for these accomplishments or

1  that he had any role in the decision to terminate any technician, Graham provided this positive feedback

2  based on his belief that Maestri had provided training, regular feedback, and overall leadership to his

3  technicians and that he had participated in the disciplinary decisions for which he was credited.  *Id.*

4  Maestri's description of his role as a "glorified secretary of data entry" is inconsistent with Graham's

5  expectations for first-level managers and his assessment of Maestri's job performance.  *Id.*, ¶ 11.

6
7
        **c.**        **Even If Their Claims of Non-Managerial Tasks Were Credited, the Deponents' Testimony Demonstrates a Wide Divergence in Job Duties That Weigh Against Collective Treatment of Plaintiffs' Claims.**

8  Even if the deponents' claims of performing non-managerial job duties were credited, the

9  deposition testimony still demonstrates a wide divergence between the duties deponents say they

10  performed and the duties reported by field managers who submitted declarations submitted with this

11  brief or who participated in the Field Research survey.  On one end of the spectrum, deponents allege

12  that field managers do little more than gather and convey information.  On the other end of the spectrum,

13  numerous field managers who submitted declarations or who participated in the survey reported that

14  they make decisions regarding discipline, suspension and termination, that they exercise discretion in

15  directing work assignments, that they provide informal training, that they resolve grievances, and that

16  the evaluate performance with subjective and objective factors.  *See* section II.C, *supra*.  In order to

17  determine where any putative class member falls on this wide spectrum, the Court would have to make

18  an individualized determination regarding which duties each putative class members does and does not

19  perform.  Such an individualized assessment renders collective treatment of plaintiffs' claims untenable.

20  *See Reich v. Homier Distrib. Co.*, 362 F. Supp. 2d 1009, 1013-14 (N.D. Ind. 2005) (denying collective

21  action certification where extensive discovery would be necessary to ascertain whether each putative

22  class member exercised discretion in carrying out his or her job duties and if so, how much) (collecting

23  cases); *Morisky v. Pub. Serv. Elec. & Gas Co.,* 111 F. Supp. 2d 493, 498-99 (D.N.J. 2000) (denying

24  collective action certification where defendants pointed to "many specific dissimilarities between the job

25  duties of the name[d] plaintiffs and the opt-in plaintiffs," and noting that "[e]ven employees who [held]

26  the same job title [did] not necessarily perform the same work").

27  Indeed, the deposition testimony demonstrates a wide divergence of experiences even among the

28  deponents, as significant differences exist in the ways that plaintiffs perform their jobs:

- ▪  Luque denied that he even once made a recommendation to discipline a technician or told a technician that he needed to improve his performance. Luque Depo., 114:21-115:17. In contrast, Richardson admitted that he recommended suspension for several technicians and his area manager always agreed, (Richardson Depo., 222:24-225:1, 258:4-25); that on three separate occasions he recommended to his area manager that technicians should be terminated and on all three occasions his area manager agreed (*id.*, 235:6-14, 266:9-267:1); and that he is aware of only one occasion in which his area manager declined to follow a recommendation that he made regarding discipline (*id.*, 313:16-316:25).

- ▪  Some deponents testified that they provide on-the-job training to technicians regarding job skills and supervise technicians in the field, while others said that they do not provide any on-the-job training to technicians. *Compare* Knutson Depo., 105:17-107:11, 109:1-9, 137:22-138:13 (Knutson provides informal on-the-job training to technicians) *with* Keselica Depo., 131:9-11 (Keselica does not provide any informal training to technicians).

- ▪  Some deponents testified that they do not (or rarely) submit waivers regarding performance improvement plans for technicians because they believe that such waivers will not be granted, while others testified that they have requested—and have been granted—waivers of discipline so that technicians are not placed on performance improvement plans in situations where they otherwise would be. *Compare* Knutson Depo., 242:4-244:25 (Knutson rarely submits waivers) *with* Richardson Depo., 215:20-216:17 (Richardson recommended waiver and supervisor agreed) *and* Maestri Depo., 249:22-251:10 (Maestri requested waivers that were approved by area manager and MSOC coach).

Even under the "lenient" standard for conditional certification, a manager like Luque, who allegedly "never" recommended discipline of technicians, is not in any meaningful sense "similarly situated" to a manager like Richardson, who admittedly made numerous disciplinary recommendations that were followed by higher-level management on all but one occasion. Yet in order to adjudicate the claims of putative class members, this Court would have to determine, as to each putative class member,

1  whether (like Luque) he or she "never" made a disciplinary recommendation or whether (like

2  Richardson) he or she did make disciplinary recommendations that were approved by higher-level

3  managers.  Such individualized determinations simply cannot be made on a collective basis.

### 5.   The Depositions Reveal a Multitude of Credibility Conflicts That Cannot Be Resolved Without Individualized Adjudications.

6  Many of the deponents took the most extreme positions possible in saying they did not perform

7  managerial duties.  In that way, these deponents demonstrated the numerous credibility conflicts that

8  cannot be resolved without individualized adjudications, which, of course, is contrary to class treatment.

9  For example, Luque said that, in four years, he never once criticized any of his technicians'

10  performance, never told any of his technicians that they needed to improve their performance, never

11  imposed any sort of discipline on his technicians, and never recommended termination or any other

12  discipline for his technicians because he had "100% perfect technicians who never required counseling,

13  coaching, criticism, performance improvement, discipline, [or] termination."  (Luque Depo., 114:17-

14  115:17.)  He further testified that he never supervised technicians (*id.*, 171:17-172:9), never had a

15  performance discussion with a technician or contractor (*id.*, 160:18-161:4), never resolved disciplinary

16  issues with the union that represented the technicians (*id.*, 161:5-9), and never hired a technician or

17  recommended the hiring of a technician (*id.*, 163:16-164:8).  Rather, according to Luque, his job duties

18  involved merely "passing information through to [his] team and then reinforcing."  *Id.*, 163:3-10.

19  This testimony is directly at odds with the testimony of Luque's area manager and the

20  contemporaneous documentation showing the managerial duties performed by Luque.  Huffman Decl.,

21  ¶¶ 16-18; Luque Depo., Exhs. 42-47, 52-58.  To decide which version is correct—Luque's or

22  Huffman's—the Court would need to receive testimony from both, as well as from Luque's peers and

23  subordinates and others.  That process plainly would be inconsistent with class treatment.[14]

---

[14]    Indeed, Luque's testimony was so much in conflict with the contemporaneous documentation that one only can infer he was heavily coached.  For example, Luque prepared a résumé in which he wrote, "I have a total of 33 years plus with AT&T.  I've been in AT&T Management for 18 years.  I have managed technicians for 18 years.  I have a proven track record of accomplishing any given task at a higher level of performance.  I can motivate people to exceed their goals.  I am a leader!"  When confronted with these admissions, which plainly were at odds with his testimony, Luque claimed that he was referencing his Marine Corps experience, even though the quoted passage appears on the résumé in connection with Luque's AT&T Corp. field manager position, and text concerning his Marine Corps experience appears on a separate page.  Luque Depo., 224:6–230:5, Exh. 50.

Likewise, Keselica testified that he did not "supervise," "direct" or "train" technicians, that his technicians "managed themselves," and that his role merely involved "gathering information for the company as needed." Keselica Depo., 126:12-131:11, 136:19-137:2, 139:13-16, 150:7-151:11. Although his area manager credited Keselica in 2006 for his team's high performance ranking, Keselica alleges that the only thing he did to deserve credit for his team's high ranking was supply them with "helpful information" and order them tools. *Id.*, 152:4-153:12, 203:4-204:2. Moreover, despite the abundant technician disciplinary records in which Keselica wrote "I informed [a technician] of *my decision* to suspend him without pay pending further investigation" (*id.*, 313:8-320:13, Exh. 309) (emphasis supplied), "I brought you back in today to interview and *I will suspend you* pending further investigation" (*id.*, 324:25-335:8, Exh. 310), and "*I have made the decision* that you violated the Code of Business Conduct" (*id.*, 335:11-343:10, Exh. 311), Keselica denied that he made disciplinary decisions or even recommendations to discipline technicians, alleging that defendants' human resources personnel made all decisions but told him to represent to the employee that he had made the decision. *Id.*, 319:18-329:12, 321:19-322:24, 330:16-331:13.

Maestri likewise testified that he does not train, direct, or supervise technicians (Maestri Depo., 46:18-47:6), that he does not manage or coach technicians (*id.*, 310:10-14),  and that he is "basically a glorified secretary of data input" (*id.*, 341:1-2).  Yet Maestri prepared notices of termination for at least two technicians in which he reminded them that, in prior discussions, he had warned if they failed to improve their performance, "*I would recommend your termination from AT&T*." *Id.*, 289:8-21, 314:10-25, Exh. 327, 331 (emphasis supplied).  Confronted with this documentation, Maestri still denied he ever made a recommendation regarding a potential technician termination. *Id.*, 334:4-17.  Maestri alleged instead that defendants' human resources personnel provided him with such verbiage and he read it *verbatim* to the affected technicians—even to the point of reading to them in the past tense a description of the termination meeting during the meeting itself. *Id.*, 290:24-298:4, 314:11-25.

And Jenvey denied that he manages technicians, but in his résumé he described his duties as "managing a workforce responsible for the timely repair of cable and high-priority circuit failures." Jenvey Depo., 79:23-80:2, 82:23-85:3, Exh. 71.  In deposition, he contended that this description is not accurate and that he "was trying to find another job" and was "obviously, going to try to sell [himself] in

1  a way that [would allow him to] find another job." Jenvey Depo., 83:3-85:3.  A trier of fact hearing

2  evidence specific to Jenvey—and not just class evidence—would have to decide whether Jenvey was

3  lying on his résumé or in his deposition.

4  Besides the above documentation, defendants could present other substantial evidence rebutting

5  these deponents' outlandish claims that they never performed any managerial responsibilities.  Because

6  the claims could be resolved only on an individualized basis, a class may not be properly certified here.

7  **D.    The *Perkins* Certification Is Inapposite to This Court's Determination in This Case.**

8  Plaintiffs urge the Court to grant conditional certification of a class based on the District of

9  Connecticut's decision in *Perkins v. Southern New England Telephone Co.*, 669 F. Supp. 2d 212 (D.

10  Conn. 2009), brought against defendants' corporate affiliate, Southern New England Telephone

11  ("SNET"), which is not a party here.  But as a basic principle, each case must be adjudicated based on

12  the factual record presented to the court in that case.  Here, the records are distinctly different.  For

13  example, the *Perkins* court did not have the benefit of statistical survey evidence showing that the vast

14  majority of the putative class are not similarly situated, as is the case here.

15  Further, defendants submit that the *Perkins* decision was wrongly decided and expect that SNET

16  ultimately will prevail in demonstrating that the class members are not similarly situated.  Although

17  SNET may have to await trial to adequately develop the factual record, this Court, having substantially

18  more evidence before it, including survey evidence, than did the District of Connecticut, does not have

19  to do that here—especially when that evidence shows concrete examples of the disparity between

20  plaintiffs' alleged duties and that of the vast majority of the class they purport to represent.

21  Accordingly, this Court should not rely on *Perkins* in ruling on plaintiffs' motion and instead,

22  should focus on the facts and legal arguments that pertain to this case.[15]

23  **IV.    PLAINTIFFS' PROPOSED NOTICE IS DEFICIENT**

24  If the Court reaches the issue of the form of plaintiffs' proposed notice, defendants note that it is

25  deficient in several material aspects.

26

27  [15]    Defendants here are not relying on the argument that SNET primarily advanced and which the
*Perkins* court rejected: that the class should not be certified because the plaintiffs' definition was so

28  ambiguous that SNET could not identify the class members.  669 F. Supp. 2d at 216-17.

First, the styling of the notice—which includes a signature line for the Court and states in bold font that the notice "has been authorized by the federal district court"—reasonably could be perceived by a non-lawyer as a judicial endorsement of plaintiffs' claims.  The Supreme Court has cautioned courts to avoid "even the appearance" of any judicial sponsorship of plaintiffs' claims.  *Hoffman-LaRoche,* 493 U.S. at 174; *see also Woods v. New York Life Ins. Co.*, 686 F.2d 578, 582 (7th Cir. 1982) (vacating authorization of notice because, among other defects, notice included signature of judge and, therefore, connoted judicial sponsorship).  To be sure, plaintiffs have included, at the end of their proposed notice, a statement that "[t]he Court has not yet expressed any opinion about the merits of the claims asserted or the defenses raised, and you should not interpret the sending of this notice as any indication of the court's opinion of the ultimate outcome of this case."  But this statement should be included on the first page of the notice, not buried in the back.  *See Gerlach v. Wells Fargo & Co.*, No. C 05-0585 CW, 2006 U.S. Dist. LEXIS 24823, at *13 (N.D. Cal. Mar. 28, 2006) (plaintiffs' notice could be perceived as judicial endorsement of action, and statement that court took no position on case was insufficient because it was "seemingly tacked onto the end of the notice"); *Boyd v. Jupiter Aluminum Corp.,* No. 2:05-CV-227 PPS APR, 2006 U.S. Dist. LEXIS 35654, at *18 (N.D. Ind. May 31, 2006) (requiring disclaimer to be moved to first page of notice).

Second, plaintiffs' proposed notice fails to advise putative class members that, if they choose to opt-into the litigation, they may be required to sit for depositions and/or testify in court.  Such a disclosure is necessary for putative class members to make informed decisions as to whether they desire to join in the litigation and is commonly included in notice forms.  *See, e.g., Schwed v. G.E.*, 159 F.R.D. 373, 379 (N.D.N.Y. 1995) ("While the suit is proceeding, you may be required to provide information, sit for depositions, and testify in court.")

Third, the notice does not include a time limit for potential claimants to opt-in to the suit.  The Court should permit enough time for potential claimants to opt-in, but it should be sufficiently short for the parties to engage in discovery without fear of contacting represented parties.  Consistent with the notice period used by many other courts, defendants would recommend a 30-day response period.  *See, e.g.*, *King v. ITT Cont'l Baking Co*., No. 84 C 3410, 1986 U.S. Dist. LEXIS 29321, at *15 (N.D. Ill. Feb. 18, 1986) (30 days); *Watkins v. Milliken & Co*., 613 F. Supp. 408, 421 (W.D.N.C. 1984) (30 days); *Held*

1   *v. Nat'l R.R. Passenger Corp.*, 101 F.R.D. 420, 423 (D.D.C. 1984) (30 days); *Johnson v. Am. Airlines,*

2   *Inc.*, 531 F. Supp. 957, 962 (N.D. Tex. 1982) (21 days).

3        Finally, and importantly, the notice refers only generally to "field managers" and fails to

4   adequately define the members of the proposed class, and does not adequately describe in detail the

5   claims alleged in the lawsuit or the remedies that plaintiffs seek.  Without understanding the full extent

6   of the legal claims plaintiffs assert, a putative class member cannot make an informed decision about

7   whether to opt in to the suit.  Although plaintiffs' notice should describe the case in more detail,

8   defendants, too, should be allowed to provide a more thorough explanation of their position in any such

9   notice.  *Gerlach,* 2006 U.S. Dist. LEXIS 24823, at *13 (not allowing "one-sided and argumentative"

10  description of lawsuit in notice).

11  **V.     CONCLUSION**

12       Plaintiffs have not met their burden of proof that they are "similarly situated" to Pacific Bell and

13  AT&T Corp. field managers statewide to warrant conditional certification.  Their eighteen declarations,

14  which are not representative of the field managers they wish to represent, fall far short of the proof

15  required to grant certification.  By comparison, defendants' abundant evidence—including the Field

16  Research scientific survey of 367 respondents, 30 field manager declarations, extensive documentation

17  and area manager declarations showing defendants' expectations of the field manager positions at issue,

18  and depositions of 11 plaintiffs, would-be opt-ins, and other declarants—show convincingly that field

19  managers are not similarly situated, whether by organization, job duties, or job performance, and that the

20  issue of their exempt status must be decided on an individualized, not a class, basis.

21       The Court should deny plaintiffs' motion for conditional certification.

22  Dated:  August 27, 2010.              J. AL LATHAM, JR.
                                          JEFFREY D. WOHL
23                                        WILLIAM C. BARKER
                                          PAUL, HASTINGS, JANOFSKY & WALKER LLP
24

25                                        By:   /s/ Jeffrey D. Wohl
                                                Jeffrey D. Wohl Attorneys for Defendants
26                                            AT&T Corp., Pacific Bell Telephone Company, and
                                                AT&T Communications of California, Inc.
27

28