Thomas Marc Litton (SBN 119985)
tlitton@swhlegal.com
**SANFORD WITTELS & HEISLER, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone:  (415) 421-4774
Facsimile:  (415) 421-4784

Steven L. Wittels (*pro hac vice*)
swittels@swhlegal.com
Jeremy Heisler (*pro hac vice*)
jheisler@swhlegal.com
**SANFORD WITTELS & HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 723-2947
Facsimile: (646) 723-2948

*Attorneys for Plaintiffs Joe Lewis Luque,*
*Herman Richardson, and the Plaintiff Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **JOE LEWIS LUQUE,** *et al.,* | |
| **Plaintiffs,** | **3:09CV5885 (CRB)** |
| **v.** | **HEARING DATE: October 29, 2010** |
| **AT&T CORP.,** *et al.,* | **TIME: 10:00 A.M.** |
| **Defendants.** | |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION**
**AND ISSUANCE OF NOTICE TO THE COLLECTIVE ACTION CLASS**

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT ...........................................................................................1

I.    Reiteration of the Lenient Standard at the Notice Stage of the Collective
Action Certification Procedure ...........................................................................4

    A.    Because discovery is incomplete, first tier analysis applies ...................................4

    B.    Under the first tier analysis, plaintiffs need only make a "minimal"
showing to justify notice ....................................................................................4

    C.    Because of the purpose and preliminary nature of the notice
inquiry, courts disregard defendants' competing evidence.....................................5

    D.    Defendants' challenges to Plaintiffs' credibility are misplaced and
irrelevant to the Court's certification analysis ......................................................6

II.    Plaintiffs' Declarations and Other Evidence are More than Sufficient to
Satisfy the Lenient Notice Standard ...................................................................7

    A.    Plaintiffs' declarations and testimony attest to the essential
uniformity of Field Manager positions ................................................................7

    B.    AT&T's designated company representatives admitted that Field
Managers are subject to a common classification policy and
perform similar duties .........................................................................................9

III.    Case Law Decisively Rejects Defendants' Arguments that Variations in
the Class Members' Jobs Prevent the Issuance of Notice and that the
Relevant FLSA Exemptions are Too Individualized for Collective
Determination ....................................................................................................10

IV.    The District of Connecticut's Certification Decision in the Related Case of
Perkins v. SNET is Extremely Persuasive if Not Controlling ..........................12

    A.    Perkins is highly relevant and dictates that the Motion be granted ......................12

    B.    Defendants' attempts to distinguish Perkins are futile ........................................14

V.    Defendants Improperly Procedured 30 Declarations from Level One Class Members.  These Declarations Should Be Disregarded For All Purposes ....................... 14

       A.    Special scrutiny is applied to communications between employers and employees in wage and hour actions ................................ 16

       B.    Defense Counsel deliberately or recklessly deceived the declarants ............................................................................................ 17

       C.    The 30 declarations violate this Court's Local Rules in a deceptive and prejudicial manner going to the heart of the concerns at issue ........................................................................... 17

       D.    In their zeal to submit Level One declarations in the company's opposition to the Notice Motion, Defense Counsel prevented the declarants from carefully reviewing and amending their statements for complete fairness and accuracy .................................................................................... 18

       E.    Defense Counsel's deviation from its own disclosure protocols supports an inference of bad faith ................................ 19

       F.    Even if the "Who We Are" statement was properly shown to the Field Manger declarants, the disclosures are insufficient as a matter of law ................................................. 20

       G.    Defense Counsel's conduct violates ethical rules on ex parte contacts ................................................................................ 21

VI..    The So-Called "Scientific" Survey Submitted by Defendants Should Be Excluded and Disregarded; the Survey Was Conducted Improperly, Has No Probative Value, and is Entirely Irrelevant to the Present Motion ........................... 21

       A.    The survey offers no opinion relevant to the question before this Court ...................................................................... 22

       B.    The Survey should also be disregarded because it fails to meet acceptable scientific standards for survey research ........................ 23

1      1.      Jay's Survey Is Not Representative of the Class ...........................24

2              a.      Jay's  Screening  Questions  Biased  the

3                      Survey. ..............................................................................24

4              b.      The  Survey's  Low  Response  Rate  Must  Be

5                      Regarded with "Significant Caution." ...............................25

6      2.      By  Identifying  AT&T  as  the  Sponsor,  Jay  Biased

7              the Results......................................................................................26

8      3.      Dr. Jay Used Biased Survey Questions.........................................27

9  VII.    Notice  to  the  Class  of  Field  Managers  is  Particularly  Justified  to

10         Counteract  Defendants'  Misleading  and  Improper  Ex  Parte  Contacts,

11         Which Have the Potential to Chill Participation and Taint the Class ...............29

12  CONCLUSION...................................................................................................30

1

## <u>TABLE OF AUTHORITIES</u>

2

3     *CASES*                                                          *Page*

4     *Adams v. Inter-Con Sec. Sys., Inc.*,

5          242 F.R.D. 530 (N.D. Cal. 2007)………………………………………………...30

6     *Aguirre v. SBC Comm.*,

7          2007 U.S. Dist. LEXIS 17259 (S.D. Tex. 2007)………………………………...12

8     *Alba v. Papa John's USA*,

9          2007 U.S. Dist. LEXIS 28079 (C.D. Cal. Feb. 7, 2007)………………………7, 12

10     *Albert v. Warner-Lambert Co.*,

11          234 F. Supp. 2d 101 (D. Mass. 2002) ................................................................ 27

12     *Ale v. TVA*,

13          269 F.3d 680 (6th Cir. 2001)…………………………………………………...7

14     *Aros v. United Rentals, Inc.*,

15          2010 U.S. Dist. LEXIS 99762 (D. Conn. Sept. 23, 2010) ........................... 6, 7

16     *Bublitz v. E.I. duPont de Nemours & Co.*,

17          196 F.R.D. 545 (S.D. Iowa 2000) ..................................................................... 16

18     *Castaneda v. Burger King*,

19          2009 U.S. Dist LEXIS 69592 (N.D. Cal. July 31, 2009)………………………16

20     *Chabrier v. Wilmington Finance Inc.*,

21          2008 U.S. Dist. LEXIS 27761 (E.D. Pa. 2008)………………………………….3

22     *Cooke v. Gen. Dynamics Corp.*,

23          993 F. Supp. 56 (D. Conn. 1997) ..................................................................... 12

24     *County of Los Angeles v. United States Dist. Ct.*,

25          223 F.3d 990 (9th Cir. 2000) .......................................................................... 21

26     *Crawford v. Lexington*,

27          2008 U.S. Dist. LEXIS 56089 (E.D. Ky. 2008)................................................ 5

28

*Cruz v. Hook-SuperRx, LLC*,

     2010 U.S. Dist. LEXIS 81021 (S.D.N.Y. Aug. 5, 2010)…………………………...11

*Damassia v. Duane Reade, Inc.*,

     250 F.R.D. 152 (S.D.N.Y. 2008) .................................................................... 12

*Damassia v. Duane Reade, Inc.*,

     2006 U.S. Dist. LEXIS 73090 (S.D.N.Y. Oct. 4, 2006)…………………………15

*De Asencio v. Tyson Foods, Inc.*,

     130 F.Supp. 2d 660 (E.D. Pa. 2001) ......................................................... 6, 30

*Falcon v. Starbucks Corp.*,

     580 F. Supp.2d 528 (S.D. Tex. 2008)……………………………………………13

*Frank v. Gold'n Plump Poultry, Inc.*,

     2007 WL 2780504 (D. Minn. Sept. 24, 2007) ............................................. 13

*Georgine v. Amchem Prods.*,

     160 F.R.D. 478 (E.D. Pa. 1995) ................................................................... 30

*Gilbert v. Citigroup, Inc.*,

     2009 U.S. Dist. LEXIS 18981 (N.D. Cal. Feb. 16, 2009)…………………………5, 8, 11

*Hangartner, v. Provident Life & Accident Ins. Co.*,

     373 F.3d 998 (9th Cir. 2004) ....................................................................... 9

*Harris v. Vector Mktg. Corp.*,

     2010 U.S. Dist. LEXIS 56110 (N.D. Cal. May 18, 2010) ............................ 4, 5, 6, 8, 11

*Hernandez v. United Auto Credit Corp.*,

     2010 U.S. Dist. LEXIS 40209 (N.D. Cal. 2010)……………………………………...12

*Hipp v. Liberty Nat'l Life Ins. Co.*,

     252 F. 3d 1208 (11th Cir. 2001) .................................................................. 5

*Hoffmann-LaRoche Inc. v. Sperling*,

     493 U.S. 165 (1989)..................................................................... 1, 31

*Hub v. Sun Valley Co.*,

     682 F.2d 776 (9th Cir. 1982) ....................................................................... 9

*Indergit v. Rite Aid Corp.*,

    2010 U.S. Dist. LEXIS 60202 (S.D.N.Y. June 16, 2010)…………………………………..11

*In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.*,

    2010 U.S. Dist. LEXIS 82961 (W.D. Pa. Aug. 13, 2010) ................................................. 7

*In re FedEx Ground Emp. Practices Litig.*,

    2007 WL 3027405 (N.D. Ind. Oct. 15, 2007).................................................... 22, 25, 26

*In re Sunset Bay Assocs.*,

    944 F.2d 1503 (9th Cir. 1991) ...................................................................................... 9

*Jarvis v. Griffin*,

    2009 U.S. Dist. LEXIS 86484 (M.D. Fla. Sept. 23, 2009)………………………………..7

*Keshishzadeh v. Arthur J. Gallagher Servs. Co.*,

    No. 09-cv-0168 (S.D. Cal. Mar. 9, 2010)…………………………………………..21

*King v. West Corp.*,

    2006 U.S. Dist. LEXIS 3926 (D. Nebr. 2006)………………………………………...12

*Kleiner v. First Nat'l Bank*,

    751 F.2d 1193 (11th Cir. 1985) ................................................................................ 16

*Kress v. PriceWaterhouse Coopers, LLP*,

    263 F.R.D. 623 (E.D. Cal. 2009) ............................................................... *passim*

*Labrie v. UPS Supply Chain Solutions, Inc.*,

    2009 U.S. Dist LEXIS 25210 (N.D. Cal. Mar. 18, 2009)…………………………..*passim*

*Leuthold v. Destination Am., Inc.*,

    224 F.R.D. 462 (N.D. Cal. 2004).......................................................... 4, 5, 8, 9

*Lewis v. Wells Fargo & Co.*,

    669 F. Supp.2d 1124 (N.D. Cal. 2009) .................................................... 4, 5, 6

*Li v. A Perfect Day Franchise Inc.*,

    2010 U.S. Dist LEXIS 107792 (N.D.Cal. Sept. 29, 2010)………………………………16

*Longcrier v. HL-A Co., Inc.*,

    595 F.Supp 2d 1218 (S.D. Ala. 2008).......................................................... *passim*

*Marlo v. United Parcel Serv., Inc.*,

    251 F.R.D. 476 (C.D. Cal. May 19, 2008)......................................................... 27

*Marlo v. United Parcel Serv., Inc.*,

    254 Fed. Appx. 568 (9th Cir. 2007)................................................................ 22

*McElmurry v. U.S. Bank Nat'l. Assoc.*,

    2005 U.S. Dist. LEXIS 44452 (D. Or. 2005) ................................................ 12

*Mevorah v. Wells Fargo Home Mortg., Inc.*,

    2005 U.S. Dist. LEXIS 28615 (N.D. Cal. Nov. 17, 2005)............................*passim*

*Mike v. Safeco Ins. Co. of Am.*,

    274 F.Supp.2d 216 (D. Conn. 2003).............................................................. 12

*Morden v. T-Mobile USA, Inc.*,

    2006 U.S. Dist. LEXIS 68696 (W.D. Wash. Sept. 12, 2006)..............................15

*Morgan v. Family Dollar Stores, Inc.*,

    551 F.3d 1233 (11th Cir. 2008) ............................................................. 12, 13

*National Electro-Coatings, Inc. v. Brock*,

    1988 WL 125784 (N.D. Ohio, July 13, 1988) ................................................ 13

*Nationwide Life Ins. Co. v. Richards*,

    541 F.3d 903 (9th Cir. 2008) ........................................................................ 9

*Nerland v. Caribou Coffee Co., Inc.*,

    564 F. Supp. 2d 1010 (D. Minn. 2007)..................................................... 12, 13

*Newton v. Schwarzenegger*,

    2010 U.S. Dist. LEXIS 64008 (N.D. Cal. June 7, 2010)................................5, 6, 8

*Partlow v. Jewish Orphans Home of S. Calif., Inc.*,

    645 F.2d 757 (9th Cir. 1981) ........................................................................ 1

*Pendelbury v. Starbucks Corp.*,

    518 F. Supp. 2d 1345 (S.D. Fla. 2007) ........................................... 6, 11, 12, 13

*Perkins v. S. New Eng. Tel. Co.*,

    669 F. Supp.2d 212 (D.Conn. 2009).........................................................*passim*

*Pfizer Inc. v. Astra Pharma. Prods.*,

    858 F. Supp. 1305 (S.D.N.Y. 1994) ................................................................ 25

*Ravenell v. Avis Budget Car Rental, LLC*,

    2010 U.S. Dist. LEXIS 72563 (E.D.N.Y. July 19, 2010) ...................................... 6, 11, 16

*Reich v. Gateway Press, Inc.*,

    13 F.3d 685 (3d Cir.1994) ................................................................ 13

*Reich v. S. New Eng. Telecomms. Corp.*,

    121 F.3d 58 (2d Cir.1997) ................................................................ 13

*Russell v. Wells Fargo & Co., Inc.*,

    2008 U.S. Dist. LEXIS 78771 (N.D. Cal. Sept. 3, 2008) ............................6, 11, 29

*S.E.C. v. Phan*,

    500 F.3d 895 (9th Cir. 2007) ................................................................ 9

*Schaefer v. Indiana Michigan Power Co.*,

    358 F.3d 394 (6th Cir. 2004) ................................................................ 7

*Scott v. Aetna Servs., Inc.*,

    210 F.R.D. 261 (D. Conn. 2002) ................................................................ 12, 14

*Sheffield v. Orius Corp.*,

    211 F.R.D. 411 (D. Or. 2002) ................................................................ 12

*Shiner v. Select Comfort Corp.*,

    2009 U.S. Dist. LEXIS 116209 (N.D. Ill. Dec. 9, 2009) ....................................7

*Sjoblom v. Charter Communs., LLC*,

    2007 U.S. Dist. LEXIS 94829 (W.D. Wis. Dec. 26, 2007) ........................15, 20, 29

*Smallwood v. Ill. Bell Tel. Co.*,

    2010 U.S. Dist. LEXIS 44232 (N.D. Ill. May 6, 2010) ....................................11

*Stillman v. Staples*,

    2009 WL 1437817 (D.N.J. 2009) ................................................................ 13

*Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*,

    559 F. Supp. 1189 (E.D.N.Y. 1983) ................................................................ 24

*Turner v. Bernstein*,

    768 A.2d 24 (Del. Ch. 2000).......................................................................... 16

*United States v. Dentsply Int'l, Inc.*,

    277 F. Supp. 2d 387 (D. Del. 2003)............................................................... 26

*Wang v. Chinese Daily News, Inc.*,

    236 F.R.D. 485 (C.D. Cal. 2006) ................................................................... 16

*Wilson v. Guardian Angel Nursing*,

    2009 WL 790107 (M.D. Tenn. 2009) ............................................................ 13

*Witteman v. Wisconsin Bell, Inc*.,

    2010 U.S. Dist. LEXIS 8845 (W.D.Wis. Feb. 2, 2010)............................... 6, 11

*Wlotkowski v. Michigan Bell Tel. Co.*,

    267 F.R.D. 213 (E.D.Mich. 2010) ...................................................... 6, 11, 14

*Zhao v. Benihana, Inc.*,

    2001 U.S. Dist. LEXIS 10678 (S.D.N.Y. May 7, 2001)……………………………30

## ***STATUTES AND MISCELLANEOUS***

29 U.S.C. § 216(b) ...................................................................................... 1, 5, 31

29 C.F.R. § 541.100 ............................................................................................ 25

29 C.F.R. § 541.102 ............................................................................................ 25

Fed. R. Civ. P. 32(a) ............................................................................................. 9

Fed. R. Evid. 804(b)(1) ......................................................................................... 9

Local Civ. Rule 3-4…………………………………………………………………15, 17, 18

8A Wright & Miller,  Fed. Prac. & Proc. § 2150........................................................ 9

30B Wright & Miller, Fed. Prac. & Proc. § 7073 ..................................................... 9

10A Fed. Proc. L. Ed § 26:521…………………………………………………..............9

Hazard & Hodes, Law of Lawyering, 3d Ed., Vol. 2, at 38-7…………………………………...16

Dr. Shari S. Diamond, *Reference Guide on Survey Research*,

    Fed. Judicial Ctr., Reference Manual on Scientific Evidence (2d ed. 2000)………..*passim*

*Standard Definitions: Final Dispositions of Case Codes and Outcome Rates for Surveys*"
published by the American Association for Public Opinion Research, (2009)……………...25, 26

Krosnick & Presser, "*Question and Questionnaire Design*"
 from the second edition of the Handbook of Survey Research (2010)…………………………28

1

## PRELIMINARY STATEMENT

2       Eighty (80) PacBell/AT&T Field Managers throughout California have filed opt-in forms

3  and joined this lawsuit as party plaintiffs under 29 U.S.C. § 216(b).  The Field Managers are

4  spread throughout various departments including Core Installation and Maintenance,

5  Construction & Engineering, and U-Verse.  Some are AT&T Legacy employees, who perform

6  the same jobs as PacBell Level Ones but are nominally employed by a different entity.[1]

7       With their Motion for Conditional Collective Action Certification and Issuance of Notice

8  ("Notice Motion"), Plaintiffs submit a deluge of evidence (including declarations and testimony

9  from 35 Field Managers) demonstrating that Field Managers perform the same basic job duties

10  and are subject to standard processes and policies.  They share a similar lack of decision-making

11  managerial authority and are deprived of any meaningful job discretion.  The primary difference

12  between departments is the work performed by the technicians; but Field Managers' jobs are

13  fundamentally the same.

14       Since Plaintiffs' initial Motion, **AT&T has acknowledged that it has a uniform**

15  **nationwide policy of classifying Field Managers as exempt from overtime.    It has**

16  **determined that they: perform similar jobs and duties, fall under the same job category,**

17  **are subject to the same compensation scale**.  (*See* Melzer Dec. Ex A, Brzezinski Dep.

18  Excerpts)  They are directed by common programs such as the MSOC (Management System and

19  Operating Control) module, which standardizes the manner in which Field Managers perform

20  their job functions.  As a matter of law, AT&T has admitted that its Field Managers are similarly

21  situated.  The Court need go no further.

22       Under applicable authority, this evidence is more than enough to justify granting

23  Plaintiffs' Motion and directing that notice be sent to the remaining class members.  The Motion

24  is simply a mechanism to allow Field Managers to receive a neutrally-worded notice of the

25  action, and to be afforded an opportunity to join the lawsuit and preserve their FLSA claims.[2]

26

---

27  [1] This is a function of the company's different permutations as a result of the breakup of AT&T and the divestiture and gradual reacquisition of its component companies.

28  [2] *See Partlow v. Jewish Orphans Home of S. Calif., Inc.*, 645 F.2d 757, 760 (9th Cir. 1981) (in absence of tolling, "the FLSA statute of limitations continues to run until a valid consent is

1    Until now, class members have had to rely on word of mouth as Plaintiffs' counsel has been

2    precluded from solicitation.  It is a testament to the high level of interest in this litigation that so

3    many Field Managers have joined.  Hence, courts reserve the ultimate judgment on certification

4    until stage-two decertification – after the opt-in period has closed and discovery is complete.

5         While Plaintiffs' counsel has been restricted by the ethical precepts on attorney

6    solicitation, AT&T and its attorneys have felt no such constraints in contacting the class-member

7    employees and potentially tainting the class.   Although communication with absent class

8    members is not prohibited, courts have warned that it is fraught with peril in the employment

9    context – where defendants have inherent power over their employees – and have accordingly

10   implemented appropriate limitations and corrective measures.

11        Here, there is more than a latent potential for coercion.  While Plaintiffs' Motion was

12   pending, AT&T's hireling, putative "survey" expert E. Deborah Jay, conducted discovery from

13   class members under the guise of a confidential "informational" questionnaire.  Hundreds of

14   class members were called.  The Jay survey was not what it purported to be, but actually a well-

15   worn litigation tool.  Dr. Jay compounded the harm and distorted the results by putting the

16   threatening shadow of the company behind the survey.  Her callers told Field Managers that

17   AT&T was conducting an informational survey on job duties and employee satisfaction.  Jay's

18   similar surveys have suffered judicial rejection in numerous cases. (See pp. 21-22, *infra*)

19        Nor did quiet reign on the Eastern Front.  From Atlanta, the company's lawyers, Paul

20   Hastings, pressured and cajoled, and ultimately obtained 30 declarations from Level Ones, which

21   AT&T is using to fight conditional certification.  Defense counsel acted in deceptive fashion,

22   without adequately disclosing that the declarations would be filed in court in an effort to defeat

23   the Field Managers' overtime action.  To compound the sin, Paul Hastings violated Local Civil

24   Rule 3-4 when it procured the Field Managers' signatures.  As a direct result, some declarants

25   actually believed they were assisting the Plaintiffs' case.  (See pp. 17-18, *infra*)

26        Notice to the absent class members is therefore doubly necessary to counteract the effects

27   of the company's widespread *ex parte* contacts about the lawsuit.  The notice should include

28   _____

     filed"), abrogated on other grounds by *Hoffmann-LaRoche Inc. v. Sperling*, 493 U.S. 165 (1989).

1   corrective provisions clearly stating (i) that they have a right to consult with Plaintiffs' attorneys

2   and to join the action, (ii) that the company may not question them about the lawsuit or otherwise

3   interfere with their ability to participate, (iii) and that retaliation is strictly prohibited.

4          Citing virtually no relevant case law from this jurisdiction, Defendants try to obfuscate

5   the lenient standard for conditional certification and transform it in to a searching inquiry on the

6   merits.   With only limited discovery completed, Defendants seek to highlight supposed

7   differences between the class members' jobs and to discredit their overtime claims.  Defendants

8   challenge the credibility of the Level One deponents and offer their own trumped up and

9   untested evidence gathered through improper and misleading *ex parte* contacts.

10         Defendants misconstrue, distort, and attempt to rewrite the law on conditional collective

11  action certification, the preliminary stage of the FLSA certification process.   It is well-

12  established, however, that, as long as discovery remains incomplete, the only matter at issue is

13  whether notice to the class is warranted.  Plaintiffs must merely establish at a baseline level that

14  they and the class members are "similarly situated."   The focus is on the pleadings and

15  Declarations submitted by the Plaintiffs; the Court does not engage in factual determinations, and

16  competing evidence submitted by Defendants is disregarded.[3]

17         Courts typically grant conditional certification and authorize notice based on even a

18  handful of plaintiff declarations.  Defendants' assertions that the administrative and executive

19  exemptions are too individualized for collective adjudication are irrelevant and simply incorrect.

20  In fact, misclassification cases are often certified as archetypes for class treatment.  The Court

21  should follow the decision in the related action by AT&T Field Managers in Connecticut (there

22  on the more stringent stage-two decertification and Rule 23 standards) and grant Plaintiffs'

23  motion.  *See Perkins v. S. New Eng. Tel. Co.*, 669 F. Supp.2d 212 (D.Conn. 2009).

24  _____

25  [3]  Even at decertification, class members need only be "similarly situated," not identically
    situated, to merit collective adjudication.  *See, e.g., Perkins v. S. New Eng. Tel. Co.*, 669 F.
26  Supp.2d 212, 217-221 (D. Conn. 2009); *Morgan v. Family Dollar Stores, Inc.*, 551 F. 3d 1233
    (11th Cir. 2008).   Moreover, even after the completion of discovery, defendants' attempt to
27  identify outliers in the class population does not suffice to defeat collective certification.  *E.g.
    Chabrier v. Wilmington Finance Inc.*, 2008 U.S. Dist. LEXIS 27761, at *9 (E.D. Pa. 2008).  *See
28  also Morgan*, 551 F.2d at 1249 (upholding denial of decertification where 90% of the manager
    class exercised little discretion and spent 80 to 90% of their time on non-exempt duties).

1
2

I.      **Reiteration of the Lenient Standard at the Notice Stage of the Collective Action Certification Procedure**

3
4
5

In their opposition to the Notice Motion, Defendants have sought to gloss over the highly lenient standard for conditional certification and to embroil the Court in a fact-intensive analysis of their tainted evidence.  Defendants misstate the law.

6

A.      *Because discovery is incomplete, first tier analysis applies*

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Courts in this District are firm that the first, notice phase of the certification inquiry applies until discovery has been completed and the class members have been given an adequate opportunity to opt-in and provide relevant evidence.  *E.g. Labrie v. UPS Supply Chain Solutions, Inc.*, 2009 U.S. Dist LEXIS 25210, at *12 (N.D. Cal. Mar. 18, 2009)(first tier analysis applies when the case is "not ready for trial"); *Kress v. PriceWaterhouse Coopers, LLP*, 263 F.R.D. 623, 628-29 (E.D. Cal. 2009); *Lewis v. Wells Fargo & Co.*, 669 F. Supp.2d 1124, 1127-28 (N.D. Cal. 2009); *Leuthold v. Destination Am.*, Inc., 224 F.R.D. 462, 467-68 (N.D. Cal. 2004).  *See also Harris v. Vector Mktg. Corp.*, 2010 U.S. Dist. LEXIS 56110, at *30 (N.D. Cal. May 18, 2010). Here, there has been only limited discovery – some exchange of documents and 11 opt-in depositions.  Although 80 opt-ins have joined, there has been no direct solicitation by counsel. The present Motion asks that Defendants provide the names and addresses of all Field Managers so that notice can go out.  In cases such as those cited above, courts have applied the liberal first stage analysis where discovery is far more advanced than in this action, even on the verge of completion.  It would be incongruous and unduly prejudicial to apply the decertification standard when there has been no initial certification decision and when class members have not been given notice and a meaningful opportunity to participate.  By contrast, there is little prejudice to defendants if notice is granted; they will still have an opportunity to decertify.  *Leuthold*, 224 F.R.D. at 467-68.  Without saying so directly, Defendants essentially seek to apply the second, full-record stage of the certification process even though a full record is not yet available.

26
27

B.      *Under the first tier analysis, plaintiffs need only make a "minimal" showing to justify notice*

28

At this, the first stage of the two-part certification procedure, the inquiry centers on

whether notice should be sent to the class. *E.g. Newton v. Schwarzenegger*, 2010 U.S. Dist. LEXIS 64008 (N.D. Cal. June 7, 2010); *Leuthold*, 224 F.R.D. at 467; *Labrie*, 2009 U.S. Dist LEXIS 25210, at *6, 10, 20-22; *Kress*, 263 F.R.D. at 627; *Lewis*, 669 F. Supp.2d at 1127. Plaintiffs' burdens at the notice stage are exceedingly low. They need only make "substantial allegations," supported by *some* evidence, that they and the class members were "victims of a single decision, policy, or plan." *E.g. Lewis*, 669 F. Supp.2d at 1127; *Kress*, 263 F.R.D. at 627, 629; *Newton*, 2010 U.S. Dist. LEXIS 64008, at *8; *Leuthold*, 224 F.R.D. at 468; *Gilbert v. Citigroup, Inc.*, 2009 U.S. Dist. LEXIS 18981, at *3-4 (N.D. Cal. Feb. 18, 2009) ("movant bears a very light burden;" only a "minimal showing" is needed); *Harris*, 2010 U.S. Dist. LEXIS 56110, at *3-4 (plaintiffs "must simply show that there is *some* factual basis beyond the mere averments in their complaint for the class allegations")(emphasis added); *Labrie*, 2009 U.S. Dist. LEXIS 25210, at *10-11 (same). In a misclassification case, plaintiffs must only make a baseline showing that they share similar (but not identical) duties. *E.g. Kress*, 263 F.R.D. at 629-30; *id.* at 631 ("*some* evidence of similarity suffices at this stage") (emphasis added).

The standard for conditional certification "is a lenient one that typically results in certification" and authorization of notice to the class. *Lewis*, <u>supra</u>, at 1127; *Kress*, <u>supra</u>, at 628; *Harris*, 2010 U.S. Dist. LEXIS, at *3; *Leuthold*, 224 F.R.D. at 467. In fact, despite Defendants' objections that the proposed class includes Field Managers in more than one official title and department, "Courts routinely grant conditional certification of multiple-job-title classes such as Plaintiffs' class." *Lewis*, <u>supra</u>, at 1128 (collecting cases). As a general matter: "A close call as to whether Plaintiffs are similarly situated should be resolved in favor of certification." *Crawford v. Lexington*, 2008 U.S. Dist. LEXIS 56089 at *7 (E.D. Ky. 2008). The "similarly situated" standard of 29 U.S.C. § 216(b) is even less stringent than the requirements for Rule 20 joinder. *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F. 3d 1208, 1210 (11th Cir. 2001).

### C.    Because of the purpose and preliminary nature of the notice inquiry, courts disregard defendants' competing evidence

Due to the lenity of the notice standard, opposition evidence submitted by defendants is commonly disregarded. Courts do not engage in fact-finding or determinations on the merits.

1    The burden for plaintiffs at the notice stage is so low that "courts need not consider

2    evidence provided by defendants;" instead, a defendant's evidence only comes into play when

3    the full factual record is available at the post-discovery decertification phase.   *Kress*, 263 F.R.D.

4    at 628; *Lewis*, 669 F.Supp.2d at 1128 (disregarding defendants' 54 declarations at notice stage);

5    *Labrie*, 2009 U.S. Dist. LEXIS 25210, at *20 & n.7 (disregarding survey and report of Dr. Jay);

6    *Wlotkowski v. Michigan Bell Tel. Co*., 267 F.R.D. 213, 219 (E.D.Mich. 2010); *Witteman v.*

7    *Wisconsin Bell, Inc*., 2010 U.S. Dist. LEXIS 8845, at *5-7 (W.D.Wis. Feb. 2, 2010); *Ravenell v.*

8    *Avis Budget Car Rental, LLC*, 2010 U.S. Dist. LEXIS 72563, at *13-16 (E.D.N.Y. July 19, 2010)

9    ("Avis' declarations do not provide a valid basis for forestalling conditional certification and

10   notice"); *Aros v. United Rentals, Inc.*, 2010 U.S. Dist. LEXIS 99762, at *10-11 (D. Conn. Sept.

11   23, 2010); *De Asencio v. Tyson Foods, Inc.*, 130 F.Supp. 2d 660, 663-64 (E.D. Pa. 2001).  As

12   summarized in *Harri*s, 2010 U.S. Dist. LEXIS 56110, at *6-7 (citations, brackets omitted):

13       competing declarations will not as a general rule preclude conditional certification…
         while it may be true that the defendant's evidence will *later* negate the plaintiff's claims,
14       that should not bar conditional certification at the first stage.[4]

15            **D.    Defendants' challenges to Plaintiffs' credibility are misplaced and**

16                   **irrelevant to the Court's certification analysis**

17            In their opposition, Defendants seek to highlight purported inconsistencies in Plaintiffs'

18   depositions as well as supposed discrepancies between their resumes and their declarations and

19   testimony.  These efforts are unavailing.  As courts have emphasized, possible contradictions in

20   testimony "are matters of credibility for the factfinder, not individualized defenses" preventing

21   collective treatment – even at stage-two decertification. *E.g. Pendelbury v. Starbucks Corp.*, 518

22   F. Supp. 2d 1345, 1362-63 (S.D. Fla. 2007); *Crawford*, 2008 U.S. Dist LEXIS 56089, at *37-38.

23            This issue was squarely addressed in *In re Enterprise Rent-A-Car Wage & Hour*

24   *Employment Practices Litig.*, 2010 U.S. Dist. LEXIS 82961, at *61 (W.D. Pa. Aug. 13, 2010):

25       Defendants attack the statements contained in the declarations submitted by plaintiffs,

---

26   [4] *See also Newton*, 2010 U.S. Dist. LEXIS 64008, at *13 ("In opposition to conditional
     certification defendants would have the court decide the merits of the action without
27   completing discovery or briefing a motion to dismiss or for summary judgment."); *Russell v.*
     *Wells Fargo & Co., Inc*., 2008 U.S. Dist. LEXIS 78771, at *9 (N.D. Cal. Sept. 3, 2008)
28   (inappropriate at stage one to "evaluate the relative strength of the parties' evidence").

arguing that deposition testimony of the sample plaintiffs contradicts statements in the declarations. Defendants argue that those plaintiffs' resumes and statements on job applications contradict the declarations. The credibility issues raised by defendants' argument, however, are not relevant to first step. At the initial assessment stage, before discovery is completed, the court does not resolve factual disputes, decide substantive issues going to the ultimate merits or make credibility determinations.

(collecting cases, citations omitted).  *Accord Aros*, 2010 U.S. Dist LEXIS 99762, at *9-10.

As the *Perkins* court emphasized, the application of an FLSA overtime exemption:

does not depend on an employee's general characterization of his or her job in a resume designed to enhance the employee's duties and responsibilities to obtain a job…. What is important is what an employee actually does on a day-to-day basis.

669 F. Supp.2d at 219 n.3 (citing *Ale v. TVA*, 269 F.3d 680, 688 (6th Cir. 2001))  Applying the tougher decertification inquiry, *Perkins* rejected SNET's reliance on plaintiffs' resumes to argue that they "had more discretion or a larger leadership role than to which they testified."  *Id*.[5]

## II.   **Plaintiffs' Declarations and Other Evidence are More than Sufficient to Satisfy the Lenient Notice Standard**

### A.   *Plaintiffs' declarations and testimony attest to the essential uniformity of Field Manager positions*

Defendants claim that the declarations submitted by Plaintiffs are not representative of any other employees in the class.   Again, this is not the relevant inquiry, and Defendants mischaracterize the law and the facts.   The only question is whether there is a sufficient showing, on the lenient first-tier standard, to justify the mailing of notice.   Courts in this Circuit have frequently granted conditional certification and issuance of notice based on only "a handful of

---

[5] As emphasized by these cases, it is the employee's actual day-to-day duties which are relevant to an exemption analysis, not the general labels contained in job descriptions, applications, resumes, and performance evaluations.  *See also*, e.g., *Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394, 400-401 (6th Cir. 2004); *Shiner v. Select Comfort Corp.*, 2009 U.S. Dist. LEXIS 116209, at *9 (N.D. Ill. Dec. 9, 2009); *Jarvis v. Griffin*, 2009 U.S. Dist. LEXIS 86484, at *23 (M.D. Fla. Sept. 23, 2009); *Alba v. Papa John's USA*, 2007 U.S. Dist. LEXIS 28079, at *36 (C.D. Cal. Feb. 7, 2007) (job description "cannot replace what the [employee] **actually** does;" otherwise defendants could "fashion an idealized description" designed to avoid overtime laws)

Like a job description, Defendants' documents, which they claim conclusively establish the company's high-level managerial expectations for the Level Ones, speak in generalities and bullet points.  Plaintiffs' declarations and testimony clarify what their jobs are **actually** like at the ground level.  (*See*, *e.g*., Goldstein Reply Dec. at 6 ¶ 13, Clarification)

---

declarations." *Harris*, 2010 U.S. Dist. LEXIS 56110, at *6 (collecting cases); *id*. at *29. *See*, *e.g.*, *Lewis*, 669 F. Supp.2d at *9 (authorizing notice to nationwide multi-title class based on 27 declarations and other evidence); *Kress*, 263 F.R.D. at 630-31 (authorizing notice to nationwide class based on "some evidence" of similarity, including "several" declarations and depositions); *Leuthold*, 224 F.R.D. at 468 (granting conditional cert based on complaint and affidavits from three lead plaintiffs); *Newton*, 2010 U.S. Dist. LEXIS, at *11 (seven declarations on behalf of class of thousands of correctional officers); *Labrie*, 2009 U.S. Dist. LEXIS 25210, at *13-14 (thirty declarations on behalf of nationwide class of approximately 1,650 employees); *Gilbert*, 2009 U.S. Dist. LEXIS 18981, at *11-13 (granting conditional certification of 878-member nationwide class based on declarations from five employees who worked in seven branches in California and evidence that all class members subject to same compensation system); *Escobar v. Whiteside Constr. Corp.*, 2008 U.S. Dist LEXIS 68439, *10-11, 14 (N.D. Cal. Aug. 21, 2008) (complaint and declarations from three named plaintiffs justified notice to 292-member class).[6]

  Plaintiffs have presented substantial evidence – including declarations and deposition excerpts from 35 Level Ones – that Field Managers in Core Installation and Maintenance (Network Services), Construction & Engineering, and U-Verse as well as AT&T Legacy employees perform similar jobs with a similar lack of actual managerial authority and discretion. They follow uniform processes and procedures. They all work long hours. And, they are subject to a common policy classifying them as exempt from overtime.[7]   (*See* Doc. 35-4 to 35-21,

---

[6] After certification, FLSA cases continue to proceed and are tried on representative evidence from a small percentage of the class members. See infra n.13.

[7] As alleged in the Complaint and as seen in the Declarations and initial Notice Motion, the single substantive distinction is that Field Managers in Construction & Engineering distribute job assignments to the technicians from a preset bucket of work with established priorities and due dates. Their role in this area is limited. Like other Field Managers, they do not determine the work to be done, how long it should take, how it should be performed, what tools and techniques should be used, when it should be completed, or how many techs are needed on a project. Like other Field Managers, they do not determine the qualifications or training needed for particular tasks or types of jobs. In general, Construction & Engineering Managers do not exercise significant amounts of discretion in dividing the work among available techs.

Even at the decertification phase, the *Perkins* court found the variation in the way the work is assigned in C&E to be relatively minor and not to support a conclusion that differences between

Declarations; Melzer Dec. Exs. E-P, T Decs.; Ex. AA Opt-In Chart; Wittels Dec. Exs. "Similarly Situated Duties Charts" and "Mischaracterization Charts" and attached deposition excerpts).  The declarants and deponents have also attested that the Level Ones' job duties are similar and that they are regarded as interchangeable.  (*See id*; e.g.: Melzer Dec. Ex. J ¶¶ 12-13; Ex. T ¶¶ 3, 14)

### B.    AT&T's designated company representatives admitted that Field Managers are subject to a common classification policy and perform similar duties

At recent Rule 30(b)(6) depositions, AT&T's corporate representatives admitted that the company's national policy is to have all Field Managers throughout the country perform their job duties in a uniform manner and to be uniformly classified as exempt.[8]

AT&T Director of Quality Management Systems William J. ("Jeff") McKinney, who was responsible for MSOC's implementation, confessed that its purpose was to implement **standard practices** across the country and to ensure that Level Ones had the same responsibilities and followed the same processes and procedures.  (McKinney Dep. at 34-36, 52, 75, 103, Melzer Dec. Ex. C)  As AT&T Director, Work Measurements Stewart ("Buddy") McElhannon testified, MSOC sets the standards, expectations, and productivity goals for technicians, as well as the processes for the Field Managers to communicate to those techs the company's expectations and the techs' numerical results.  MSOC is designed to ensure that all Level Ones conform with the "right behaviors" expected by the national organization on a daily basis.  (Melzer Ex. D, McElhannon Dep. at 28, 36-37, 54, 68, 190, 197-200; McKinney Dep. at 43-46, 65, 107-108)  A critical focus of MSOC is on documentation, or filling out many forms.  (McKinney at 52-53)  In

---

the class members outweighed their substantial similarities.  *See* 669 F. Supp.2d at 220-21 & n.5.

[8] Although the depositions were nominally taken in the related *Perkins* case, they are admissible under Fed. R. Civ. P. 32(a) and/or Fed. R. Evid. 804(b)(1).  AT&T produced the witnesses, from the national organization, as its corporate representatives.  The issues in the SNET and PacBell overtime cases are exactly the same; the company is represented by the same counsel, Paul Hastings, and had the same motive and opportunity to cross-examine.  *See, e.g.*, *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 914 (9th Cir. 2008); *Hangartner*, *v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1019 (9th Cir. 2004); *Hub v. Sun Valley Co.*, 682 F.2d 776 (9th Cir. 1982); 8A Wright & Miller, Fed. Prac. & Proc. § 2150; 30B Wright & Miller, Fed. Prac. & Proc. § 7073; 10A Fed. Proc. L. Ed § 26:521.  Even assuming the depositions would not be admissible at trial, they are still relevant at this preliminary stage.  *Cf., e.g.*, *S.E.C. v. Phan*, 500

---

order to formulate the system, AT&T conducted various nationwide "day-in the-life" studies of the Field Managers' jobs and hours.  The company is fully aware, and expects, that Level Ones work long hours.  (McElhannon Dep. at 106-109, 144-145, 162-165; McKinney Excerpts)

Tom Brzezinski, the company's Director of HR Compensation, admitted that the company's employment practices, including compensation policies and classification policies, are set at the national level.  He admitted that all Field Managers nationwide are in the Level 1B category, share the same pay codes, are subject to the same compensation policies and pay scale, and are uniformly classified as exempt.  They occupy two official titles (Manager Network Services, Manager Construction & Engineering); there is one job description for each title, which also applies nationally.  (Melzer Dec. Ex. A, Brzezinski Dep. Excerpts)

AT&T's compensation policies state that a "job's value" is to be determined by comparing it with "similar jobs."  Essentially, "similar jobs" should be compensated in consistent fashion.  Under AT&T's policies, jobs are "similar" "where there is at least an *80% match* between the job responsibilities and skills required."  (Ex. 7 to Brzezinski Dep., AT&T 2008 Management Comp. Plan at 4, SNET013860, Melzer Dec. Ex. B)  Questioned about this policy, Compensation Director Brzezinski admitted any Field Manager job (a position with techs reporting to it in the technical field) is generally regarded by the company as "similar in nature" and treated as exempt.  (Brzezinski Dep. at 147-151; *See also* McElhannon Dep. at 184 admitting that L-1s in U-Verse and I&R are similar)  Brzezinski further acknowledged that Level Ones are moved around between departments, even to areas where they do not have previous technical experience.  (*Id*. at 104)  Conformity and uniformity are the hallmarks of the Field Manager position.  Yet Defendants now claims that collective adjudication is impossible??

**III.**   **Case Law Decisively Rejects Defendants' Arguments that Variations in the Class Members' Jobs Prevent the Issuance of Notice and that the Relevant FLSA Exemptions are Too Individualized for Collective Determination**

At the notice stage, courts disregard defendants' assertions that adjudication of the action requires detailed individual inquiries preventing class treatment.  *Harris*, 2010 U.S. Dist LEXIS

F.3d 895, 913 (9th Cir. 2007); *In re Sunset Bay Assocs*., 944 F.2d 1503, 1509-10 (9th Cir. 1991).

56110, at *16-17; *Labrie*, 2009 U.S. Dist. LEXIS 25210, at *15-17, 20-21; *Kress*, 263 F.R.D. at

631; *Gilbert*, 2009 U.S. Dist. LEXIS 18981, at *9-11; *Escobar*, 2008 U.S. Dist LEXIS, at *12-

13; *Russell*, 2008 U.S. Dist. LEXIS 78771, at *8-10 (certifying class of employees in three

positions although there were only declarants in two and company argued third was dissimilar).

*See also Smallwood v. Ill. Bell Tel. Co.*, 2010 U.S. Dist. LEXIS 44232, at *11-14 (N.D. Ill. May

6, 2010); *Wlotkowski*, 267 F.R.D. at 218-19; *Witteman*, 2010 U.S. Dist. LEXIS 8845, at *5-7

(AT&T Outside Planning Engineer cases); *Cruz v. Hook-SuperRx, LLC*, 2010 U.S. Dist. LEXIS

81021, at *11-12 (S.D.N.Y. Aug. 5, 2010); *Ravenell*, 2010 U.S. Dist. LEXIS 72563, at *12.

     In *Smallwood*, for example, defendant claimed the relevant title actually encompassed

four distinct positions with important differences.  The court acknowledged some variations:

> However, whether these discrepancies will become important down the road does not
> affect the current question of conditional certification.  Defendant's argument regarding
> job inconsistencies has been presented at the incorrect stage of FLSA class certification.
> In arguing that this Court's "similarly situated" analysis should presently focus on the
> day-to-day work activities performed by each class member, Defendants jump ahead to a
> more exacting standard at step two that is not appropriate at the step one analysis.

2010 U.S. Dist LEXIS 44232, at *13.  Uniform classification trumped.  *Id*. at *15-16.[9]

     Defendants' assertion that misclassification cases are too individualized for class

determination is the opposite of the truth. [10]   *See, e.g.*, *Indergit v. Rite Aid Corp*., 2010 U.S. Dist.

LEXIS 60202, at *34-36 (S.D.N.Y. June 16, 2010); *Perkins*, 669 F. Supp.2d at 218; *Morgan v.*

*Family Dollar Stores, Inc*., 551 F.3d 1233, 1263 (11th Cir. 2008) ("Just because the inquiry is

fact-intensive does not preclude a collective action where plaintiffs share common job traits.");

*Pendelbury*, 518 F. Supp.2d at 1353, 1361-62 (denying decertification despite legitimate

---

[9] *See, e.g.*, *Nerland v. Caribou Coffee Co., Inc.*, 564 F. Supp.2d 1010, 1023 (D. Minn. 2007)
("The Court finds it disingenuous for [Defendant], on one hand, to collectively and generally
decide that all store managers are exempt from overtime compensation without any
individualized inquiry, while on the other hand, claiming the plaintiffs cannot proceed
collectively to challenge the exemption"); *Pendlebury*, 518 F. Supp.2d at 1352 ("Plaintiffs'
similarly situated status is further underscored by Defendant's own policy and practice of
classifying all store managers… as exempt …this exemption status is determined on a collective
basis, and not after an individualized inquiry"); *Morgan*, 551 F.3d at 1253 ("exemption policy
did not turn on any individual factors.  It was a company wide decision"); *Aros*, 2010 U.S. Dist.
LEXIS 99762, at *26-27; *Ravenell*, 2010 U.S. Dist. LEXIS 72563, at *12-13.

[10] *See also* Doc. 35, MOL in Supp. Notice Motion, at n.80 (collecting cases).

---

discrepancies between class members, particularly as to discipline); *Nerland v. Caribou Coffee Co., Inc.*, 564 F. Supp. 2d 1010, 1014, 1016 (D. Minn. 2007); *Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 264 (D. Conn. 2002) ("Several courts have held that it is appropriate to bring an FLSA exemption claim as a class action with regard to employees who perform similar, but not identical, duties notwithstanding the highly fact-specific nature of the exemption inquiry.")[11]

Defendants' supposed authority against certifying a misclassification case is misplaced.[12]

**IV.   The District of Connecticut's Certification Decision in the Related Case of *Perkins v. SNET* is Extremely Persuasive if Not Controlling**

### A.   *Perkins* is highly relevant and dictates that the Motion be granted

*Perkins v. SNET*, highlighted in the initial Motion, involved a class of AT&T Field Managers in Connecticut.  Both SNET (Connecticut) and PacBell/AT&T (California) are part of AT&T's 22-state territory.  Like the class members here, the Level Ones in *Perkins* are spread throughout Core Installation & Maintenance, Construction & Engineering, and U-Verse.  On very similar evidence to that presented here, the court certified the class on a stage two

---

[11] *See also*, *e.g.*, *Alba*, 2007 U.S. Dist. LEXIS 28079, at *31 (on even more stringent Rule 23 standard: "the fact that the determination of whether an overtime exemption applies to an employee may be a fact-intensive inquiry likewise does not defeat predominance"); *id.* at *40; *Damassia v. Duane Reade, Inc*., 250 F.R.D. 152, 160 (S.D.N.Y. 2008) (collecting sample misclassification cases certified under Rule 23).

[12] Neither of the cases cited by Defendants in support of their position, *McElmurry v. U.S. Bank Nat'l. Assoc.*, 2005 U.S. Dist. LEXIS 44452 (D. Or. 2005) and *Sheffield v. Orius Corp.*, 211 F.R.D. 411 (D. Or. 2002), applied the two-step certification mandated in this District.  Two other cases, *Hernandez v. United Auto Credit Corp.*, 2010 U.S. Dist. LEXIS 40209 (N.D. Cal. 2010) and *King v. West Corp.*, 2006 U.S. Dist. LEXIS 3926 (D. Nebr. 2006), are second stage, decertification decisions, and therefore involved a more intensive inquiry.  Nowhere in those cases did the courts support the absurd legal contention that misclassification cases can never be certified.  Similarly, *Cooke v. Gen. Dynamics Corp.*, 993 F. Supp. 56 (D. Conn. 1997), is a summary judgment decision, involving a vastly different standard and a far deeper factual inquiry.  The remaining cases cited by Defendants are also inapposite.  In *Mike v. Safeco Ins. Co. of Am.*, 274 F.Supp.2d 216 (D. Conn. 2003), the plaintiff did not submit *any* evidence to show that he was similarly situated to other individuals.   And in *Aguirre v. SBC Comm.*, 2007 U.S. Dist. LEXIS 17259 (S.D. Tex. 2007), the evidence showed that the plaintiffs did not perform a consistent set of duties and that their work resulted from the changing orders of their supervisors.  That is clearly not the case here as Plaintiffs have amply demonstrated that Field Managers have a set list of duties they are required to perform on a daily basis.  In fact, the company has spent a great deal of time and effort establishing modules dictating a Level One's "Day in the Life."

---

1  decertification standard (FLSA claims) and Rule 23 analysis (state law claims).  In the process,

2  the court razed the same arguments made by the AT&T Defendants here.

3       As in this case, "Plaintiffs testified to their lack of discretion in assigning work, in

4  disciplining technicians, in hiring, firing, or promotions, and even in menial tasks such as

5  purchasing supplies."   669 F.Supp.2d at 220.   Although some distinctions among the class

6  existed, the court found these to be exaggerated and insufficient to prevent certification.  **"[O]n**

7  **balance,"** the court concluded, **"the similarities between the plaintiffs clearly outweigh their**

8  **differences."**  *Id*. at 220-21.  The court found the company's prospective defenses – that "some

9  members of the class are exempt while others are not" – to be a merits-based argument "which is

10  not proper for the court to consider."  *Id.* at 221.  Further, "although SNET has highlighted a few

11  examples of potential class members exercising managerial discretion, a non-exempt employee

12  may spend some or his or her time performing managerial functions."  *Id.*

13       As in *Perkins*, denial of certification will result in a multiplicity of individual cases

14  involving common questions.  In contrast, a collective action is typically tried on representative

15  proof from a small percentage of the class.[13]  Can there be any question that this is the preferable

16  path?  *See Id.*; *Nerland*, 564 F.Supp. 2d at 1014; *Pendelbury*, 518 F. Supp.2d at 1363.[14]

17

---

18  [13] *See, e.g.*, *Morgan*, 551 F.3d at 1280 (testimony of seven of over 1,400 "managers" sufficient to prove liability misclassification case: "We reject Family Dollar's argument that the executive
19  exemption defense is so individualized that the testifying Plaintiffs did not fairly represent the non-testifying Plaintiffs."); *Reich v. S. New Eng. Telecomms. Corp.,* 121 F.3d 58, 67 (2d
20  Cir.1997) (testimony from 39 of 1,500 class members); *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 701-702 (3d Cir.1994); *Wilson v. Guardian Angel Nursing*, 2009 WL 790107, at *5 (M.D.
21  Tenn. 2009); *Stillman v. Staples*, 2009 WL 1437817, at *17-20 (D.N.J. 2009) (representative testimony from 13 of 342 opt-ins sufficient in misclassification case); *Falcon v. Starbucks Corp.*,
22  580 F.Supp.2d 528, 540-41 (S.D. Tex. 2008)(permitting representative testimony over individual
23  "mini-trials"); *Scott*, 210 F.R.D. at 265 (certifying misclassification case as "plaintiffs have established that their claims may be supported by generalized proof."); *National Electro-*
24  *Coatings, Inc. v. Brock*, 1988 WL 125784 at *8 (N.D. Ohio, July 13, 1988) ("Courts have
25  consistently allowed, or required, a small number of employees to testify to establish a pattern of
26  violations for a larger number of workers.").

27  [14] In any case, this avenue should not be foreclosed by a hasty decision transforming the lenient notice stage into a microscopic scrutiny where defendants can pick apart the class by zeroing in
28  on relatively meaningless distinctions.  *Cf. Frank v. Gold'n Plump Poultry, Inc.*, 2007 WL 2780504 at *4 (D. Minn. Sept. 24, 2007).

---

1

     **B.**      ***Defendants' attempts to distinguish <u>Perkins</u> are futile***

2           Defendants seek to avoid the unavoidable implications of *Perkins* by conjuring two

3 illusory distinctions.  Both should be condemned to the jurisprudential dust heap.

4           First, Defendants assert that the primary issue in *Perkins* was the ascertainability of the

5 class definition.  This is simply untrue; the issue occupies only a relatively brief foreword to a

6 well-reasoned decision on the propriety of certification.  In fact, the papers submitted to the court

7 were extensive and focused mainly on the class members' duties and authority.  SNET put in a

8 70-page brief, highlighting purported distinctions between the Level Ones; the parties each

9 submitted roughly 1,000 pages of exhibits – declarations, documents, and deposition excerpts.

10 Because of the extensive discovery completed (class discovery was closed), the court proceeded

11 directly to the second stage of the collective certification analysis.  *See* 669 F. Supp.2d at 218.

12           Second, Defendants seek to claim that the Field Managers' duties and classification status

13 at SNET in Connecticut bear little relation to that of the California Field Managers at

14 PacBell/AT&T.  This argument disregards the high degree of centralization imposed by the

15 national AT&T and is wholly refuted by the company's own admissions as described above.  *See*

16 § II(B), *supra*.  *See also* Melzer Dec. Exs. X, Y, Declarations of Albert Borchetta and Bruce

17 Ollayos in *Lawson v. BellSouth* (both of whom worked as Field Managers for AT&T entities

18 SNET and BellSouth and found their jobs to be virtually identical).

19      **V.**      <u>**Defendants Improperly Procured 30 Declarations from Level One Class**</u>

20              <u>**Members.  These Declarations Should Be Disregarded For All Purposes**</u>

21           In opposition to Plaintiffs' Notice Motion, Defendants have submitted thirty declarations

22 from Level Ones. Especially in employment cases, courts have regulated defendants' contacts

23 with prospective class members and stricken the fruits of communications that are misleading,

24 coercive, or otherwise improper.  *See* Doc. 93, *Ex Parte* Application for Continuance, at 4-7.

25 Courts have squarely held that an employer's "one-sided, misleading communications with opt-

26 in collective members could easily have the effect of tainting the entire class and jeopardizing

27 the entire litigation." *Longcrier v. HL-A Co., Inc.,* 595 F.Supp 2d 1218, 1227 (S.D. Ala. 2008).

28           The process employed by AT&T's attorneys in securing declarations from the company's

1   employees – potential collective action plaintiffs and members of the proposed class – was

2   grossly defective.  While the Motion was pending, Paul Hastings launched into a blitzkrieg,

3   soliciting declarations from Field Managers.  In this frenzy, nuance and ethics were swept aside

4   and the declarants were intimidated and bamboozled into signing lawyer-penned screeds against

5   the class.  As seen in the accompanying counter declarations, defense counsel failed to follow its

6   own "Who We Are" disclosure guidelines.  For example, Field Manager Sandra Kenny actually

7   thought she was *communicating with **Plaintiffs' counsel and assisting with Plaintiffs' case**.

8   (Kenny Reply Dec. ¶¶ 4-8)  Defense counsel failed to correct this impression by deceptively

9   omitting the case caption and title of the document, in violation of this Court's Local Rules.

10   The law clearly requires that when soliciting declarations from potential FLSA opt-ins,

11   an employer must at least disclose to the declarants that they may be entitled to become part of

12   the lawsuit and that signing the declaration could prevent them from participating and reaping

13   any future recovery.  *E.g. Sjoblom v. Charter Communs., LLC*, 2007 U.S. Dist. LEXIS 94829, at

14   *9-10 (W.D. Wis. Dec. 26, 2007); *Longcrier*, 595 F. Supp. 2d at 1228.  *See also Mevorah v.*

15   *Wells Fargo Home Mortg., Inc.*, 2005 U.S. Dist. LEXIS 28615, at *16 (N.D. Cal. Nov. 17, 2005)

16   (strongly suggesting that defense counsel bears a positive obligation to inform solicited

17   employees of **"all aspects"** of the case).  Here, PacBell's communications and disclosures were

18   either deliberately misleading or blatantly incomplete.  Therefore, the company's tainted Field

19   Manager declarations must be stricken and disregarded.[15]

### A.   *Special scrutiny is applied to communications between employers and employees in wage and hour actions*

22   Courts widely recognize that contacts by employers and their attorneys with employees

---

[15]  Moreover, as discussed above, it is "inappropriate" for the Court to credit Defendants' declarations "and render a final determination based on them at this juncture." *Ravenell*, 2010 U.S. Dist. LEXIS 72563, at *14.  Specifically, the declarations submitted by the company should be discounted because Plaintiffs have not yet been able to depose the employees who signed them, *Damassia v. Duane Reade, Inc.*, 2006 U.S. Dist. LEXIS 73090, at *24-25 (S.D.N.Y. Oct. 4, 2006); because they contain "unsupervised… one-sided presentations of the facts made in advance of … court-approved notice," *Turner v. Bernstein*, 768 A.2d 24, 26-27 (Del. Ch. 2000); and because of the "risk of bias and coercion inherent in that testimony."  *Morden v. T-Mobile USA, Inc.*, 2006 U.S. Dist. LEXIS 68696, at *9 (W.D. Wash. Sept. 12, 2006).

---

are pregnant with potential for coercion.  *See, e.g.*, *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1202 (11th Cir. 1985) ("A unilateral communications scheme... is rife with potential for coercion.  If the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive."); *Longcrier*, 595 F. Supp. 2d at 1229 ("Defendant called each of its hourly workers into a one-on-one meeting during work hours with its attorney(s), creating an inherently coercive and intimidating environment for interviews and execution of paperwork concerning pay practices."); *Li v. A Perfect Day Franchise Inc.*, 2010 U.S. Dist LEXIS 107792, at *23-26 (N.D.Cal. Sept. 29, 2010); *Mevorah*, 2005 U.S. Dist. LEXIS 28615, at *16 ("The opportunity for mischief is compounded by the relationship between the employer and the employee and the coerciveness an employee may feel."); *Wang v. Chinese Daily News, Inc.*, 236 F.R.D. 485, 488 (C.D. Cal. 2006) ("the relationship is even more potentially coercive where Defendants are the individuals' employers"); *Bublitz v. E.I. duPont de Nemours & Co.*, 196 F.R.D. 545, 548 (S.D. Iowa 2000) ("Where the defendant is the current employer of putative class members who are at-will employees, the risk of coercion is particularly high; indeed, there may in fact be some inherent coercion in such a situation."); *Ravenell*, 2010 U.S. Dist. LEXIS 72563, at *14 ("risk of bias and coercion inherent" in declarations from current employees).  *Cf.  Castaneda v. Burger King*, 2009 U.S. Dist LEXIS 69592, at *17, 22-23 (N.D. Cal. July 31, 2009) (recognizing special danger of "abuse or harassment" in employment context where defendant has "power over" prospective plaintiffs and a potential threat to their jobs lingers).[16]

Here, some declarants cooperated with AT&T's lawyers because they felt coerced or at minimum a desire to please their employer.  *See* Melzer Dec. Ex. O, Goldstein Reply Dec. ¶ 4 ("I thought I should answer the questions because I worked for the company"); Ex. M, Brennan

---

[16] *See also* Hazard & Hodes, Law of Lawyering, 3d Ed., Vol. 2, at 38-7 (Wipper Dec. Ex. D), discussing contacts with unnamed class members, even before certification:

> Where there is already an ongoing relationship...such as between a group of employees and their employer, direct independent communication between the parties is inevitable...**On the other hand, the lawyer for the opponent of the class should not be allowed to take statements concerning the matter in controversy from individual class members through *ex parte* interviews, for that could impose the very disadvantages that [Model Rule 4.2] is designed to prevent**.

1    Reply Dec. at ¶ 4 (same).

2         Furthermore, the solicitation of employee declarations demands additional scrutiny

3    because it commits "employees who are potential class members to a set of facts that may be

4    adverse to their interest . . . without their having been fully informed of all aspects of the case."

5    *Mevorah*, 2005 U.S. Dist. LEXIS 28615, at *16.  At bar, AT&T's Field Manager declarants were

6    not informed about even the most salient aspects of the case.  *See* Goldstein Dec. ¶¶ 5, 9 ("At the

7    time the lawyer called me, I was vaguely aware of a lawsuit by some Level One Managers

8    against the company but did not know the details or the issues involved."); Melzer Ex. Dec. N,

9    Day Dec. ¶¶ 8, 9 ("At the time, I did not understand the issues at stake in the lawsuit and thought

10   the statements in the 'Declaration' would support the Field Managers rather than the company.");

11   Brennan Dec. ¶ 6 ("At the time I signed the Declaration, I was unaware that my statements were

12   supportive of the company's position….Had I understood the implications of how my

13   Declaration was worded, I would have refused to sign it."); Ex. P, Kenny Reply Dec. ¶¶ 5, 6.

14        Thus, the Court should apply close scrutiny and exclude the company's declarations.

15        **B.    *Defense Counsel deliberately or recklessly deceived the declarants***

16        The Declarations should also be disregarded because there is evidence that AT&T's

17   counsel actively misled the declarants when attempting to obtain their statements.  For example,

18   counsel falsely promised Mike Day that his statements would be strictly confidential.  Day Dec.

19   ¶ 10 ("The lawyer for AT&T re-emphasized that [the declaration] was confidential and would

20   not be shown to *anyone*.").  Other declarations were likely tainted in similar fashion.

21        **C.    *The 30 declarations violate this Court's Local Rules in a deceptive and***

22               ***prejudicial manner going to the heart of the concerns at issue***

23        **Furthermore, the declarations presented to the Level Ones to be signed did not**

24   **include the case caption and a title indicating the purpose of the document.**  Such omissions

25   openly violate Local Civil Rule 3-4, which dictates that the caption and a descriptive title be

26   printed on the first page of each paper presented for filing.  This is not a harmless error of form

27   but can only be seen as a transparent attempt by AT&T to "lull prospective plaintiffs into a false

28   sense of security and to effectuate their complete cooperation with minimal resistance."

1   *Longcrier*, 595 F. Supp. 2d at 1229.  The company surely realized that the employee-declarants

2   would be reluctant to sign declarations that they knew would be used against their fellow Field

3   Managers.[17]  In fact, the omissions had precisely their desired effect.  *See* Day Dec. ¶ 12 (proper

4   caption and title would have raised "red flag" and prevented him from signing); Goldstein Reply

5   Dec. ¶ 11 (same); Brennan Dec. ¶ 7 ("I did not realize the Declaration would be filed with the

6   Court to support AT&T's defense of this lawsuit."); Kenny Dec. ¶ 8 ("**I signed the statement**

7   **believing I was submitting a declaration in support of the Field Managers and against the**

8   **company**.")    Accordingly, the 30 tainted and procedurally faulty declarations must be

9   disregarded.  *See*, *e.g.*, *Longcrier*, *supra*; Local Civ. R. 3-4.

10          **D.      *In their zeal to submit Level One declarations in the company's***

11                  ***opposition to the Notice Motion, Defense Counsel prevented the***

12                  ***declarants from carefully reviewing and amending their statements for***

13                  ***complete fairness and accuracy***

14          In addition to other evidence of bad faith, Defense Counsel pressured the Level Ones to

15  sign their draft declarations on short notice, causing them to forgo a thorough review and edit.

16  Kenny Dec. ¶ 8 ("I skimmed the 'Declaration' and it was not what I remembered saying... I

17  voiced this opinion and said I would like to make changes, and the lawyer informed me that she

18  needed the statement signed and sent back before 5:00 p.m...The lawyer made me feel incredibly

19  harassed and pressured to sign the declaration…I informed the lawyer that I did not have time to

20  deal with the 'Declaration' at the moment and could give it more attention in the next few days,

21  but she insisted that I send it back within a matter of hours."); Day Dec. ¶¶ 6, 9   ("The lawyer

22  sent me her version of my responses and instructed me to sign the form.  She did not ask me to

23  check it for accuracy or to make any relevant changes... I felt pressured to sign the form and was

24  tired of being hounded by the lawyer and spending so much time on this matter.").

25          In fact, several of the company's declarants have found their initial statements to be

26

27  _____

[17] In contrast, Paul Hastings had no trouble typing the case caption and descriptive title in
28  opposition to the Motion on its Level Two declarations.  (*See* Heisler Dec. Exs. E, F)  But when
    it submitted the innocuously labeled Field Manager "Declarations" to the Court, counsel slyly
    appended a captioned, titled cover page, perhaps to cover up its subterfuge.  (*Id*. Exs. A-D, G)

incomplete and to convey a misleading impression of their jobs.  They have sought to clarify their company-drafted declarations at length in order to correct the record.  (*See* Counter Declarations, attached to Melzer Dec. Exs. M-P)  It is assured this is a common experience.

> ### E.      Defense Counsel's deviation from its own disclosure protocols supports an inference of bad faith

Defense Counsel's actions in acquiring the declarations frequently deviated from the protocols outlined in *the company's own materials*.  Paul Hastings' "**Who We Are**" statement is clearly designed ***to be signed by the declarant***.  (Doc. 94, Wohl Dec. in Opp to *Ex Parte* Continuance Motion, Ex. A)[18]  But, there is no indication that any of the declarants actually signed the form (*see* Wohl Dec.: no mention that interviewees signed the "Who We Are" statement; no signed copies attached), and several of the thirty do not recall receiving it.  In any case, the declarants did not understand the purposes of the interview and what their declarations were being used for.  Day Dec. ¶¶ 6, 12 ("I was not shown a 'who we are' sheet or any other written statement from the company or its lawyers before signing the 'Declaration.'"); Goldstein Dec. ¶ 6 ("I do not remember receiving or signing a statement entitled 'Who We Are' or getting any explanation as to who the law firm was, what I was being asked to do, and what the effect of it could be."); Kenny Dec. ¶ 4 (attorney did not say she was from AT&T; Kenny assumed it was Plaintiffs' counsel); ¶ 7 ("I do not recall whether I was sent a 'Who We Are' statement").  A number of Level One interviewees were not even notified of the lawsuit or their right to seek counsel.  *See* Day Dec. ¶ 6; Goldstein Dec. ¶ 6.

Defense Counsel's decision to forgo signatures on the "Who We Are" forms allows the company to claim that it met disclosure requirements while in fact avoiding any meaningful disclosure.  Mike Day, David Goldstein, and Sandra Kenny, all of whom signed declarations that were submitted by PacBell, did not recall seeing the "Who We Are" form, much less signing it.  Ms. Kenny assumed throughout the interview and declaration process that she was

---

[18] It is no accident that Defendants did not attach this statement to their opposition to the Notice Motion.  They only produced it to the Court after Plaintiffs dug up the equivalent statement used by Paul Hastings in the related case against BellSouth and appended it to their *ex parte* continuance motion.  Evidently, Defendants sought to assure the court (with a wink) that it had

1   communicating with Plaintiffs' counsel and assisting her fellow Field Managers.  Each of the

2   Reply Declarants believed they were supporting Plaintiffs' action or at least not impairing it.

3           This case is similar to *Sjoblom*, 2007 U.S. Dist. LEXIS 94829, at *10, where the court

4   determined that the attorneys for the defendant-employer did not "merely overlook" problems

5   with a disclosure statement.  Here, counsel actively disregarded the directions written on the very

6   form it created for this lawsuit.  This is a strong indication of bad faith.

7           **F.      Even if the "Who We Are" statement was properly shown to the Field**

8                   **Manger declarants, the disclosures are insufficient as a matter of law**

9           Even if the Court finds that the Declarants had a sufficient opportunity to review the

10  "Who We Are" statement, the disclosures provided insufficient information about the employee-

11  declarants' rights and therefore are defective as a matter of law.   The disclosure form is

12  inadequate because it did not notify its intended targets that their declarations would be filed in

13  court and might strip them of the opportunity to join the lawsuit.  *See, e.g.*, *Longcrier*, 595 F.

14  Supp. 2d at 1228 (company's lawyers did not inform declarants that they "were themselves

15  potential class members whose execution of a form declaration for [defendant-employer] might

16  effectively strip them of an opportunity to join in the lawsuit."); *Sjoblom*, 2007 U.S. Dist. LEXIS

17  94829, at *9-10 (consent form did not "notify [potential class members] that they might be

18  entitled to become a part of the lawsuit" or "mention that signing an affidavit might waive the

19  affiant's right to become a named class member").  *See Id.* at *6 -7 (two declarants "averred that

20  they would not have signed the declaration had they been told that there was a class action from

21  which they could collect money or that signing the declaration might constitute a waiver of their

22  right to participate in the class action.").  *See also Mevorah, supra*.  Similarly here, the declarants

23  have clarified that they would not have signed if they had known these facts.  Goldstein Dec. ¶¶

24  8, 12; Day Dec. ¶¶ 9-12; Kenny Dec. p. 1-2 ; Brennan Dec. ¶ 7.

25          **G.      Defense Counsel's conduct violates ethical rules on ex parte contacts**

26          While the Model Rules of Professional Conduct have not been adopted as binding under

27  California law, the Ninth Circuit relies on them as persuasive authority.  *County of Los Angeles*

28  ─────────────────────────────────────────────

made disclosures without showing what the actual disclosures were.

1    *v. United States Dist. Ct.*, 223 F.3d 990, 993 n.1 (9th Cir. 2000).  AT&T's Defense Counsel

2    failed to comply with the Model Rules.  Specifically, Counsel violated Rule 4.1, which states:

3    "In the course of representing a client a lawyer shall not knowingly make a false statement of

4    material fact or law to a third person."  Furthermore, Counsel also violated Rule 4.3, which

5    requires a lawyer to advise an unrepresented person to secure counsel "if the lawyer knows or

6    reasonably should know that the interests of such a person are or have a reasonable possibility of

7    being in conflict with the interests of the client."  Here, there was an obvious conflict of interest

8    between the company's interests and the interests of the class member declarants, who were

9    potential beneficiaries of the present action.  Defense Counsel was required to recommend that

10   the employees contact Plaintiffs' attorneys or secure independent counsel.  *See also Mevorah*,

11   2005 U.S. Dist. LEXIS 28615, at *14-16 (citing Cal. R. Prof. Conduct 3-600).

12           For all of these reasons, the declarations submitted by the company must be stricken.

13   **VI.    The So-Called "Scientific" Survey Submitted by Defendants Should Be**

14           **Excluded and Disregarded; the Survey Was Conducted Improperly, Has No**

15           **Probative Value, and is Entirely Irrelevant to the Present Motion**

16           Apparently undeterred by a losing track-record in previous wage and hour litigation,

17   Defense counsel again improperly offers an irrelevant and *un*scientific survey by its go-to expert

18   E. Deborah Jay, Ph.D. ("Jay survey") in opposition to conditional certification.  Dr. Jay is no

19   unseasoned stripling.  She is a weathered veteran of the wage and hour wars, who has

20   consistently submitted faux-scientific "expert" reports supporting employers, often those

21   represented by Paul Hastings.  *See Labrie*, 2009 US Dist LEXIS 25210, at *19-20 (granting

22   conditional certification in misclassification case and disregarding a similar Jay survey offered

23   by counsel from Paul Hastings as "inappropriate" and "beyond the scope of this court's analysis

24   in a first tier determination."); *Keshishzadeh v. Arthur J. Gallagher Servs. Co.,* No. 09-cv-0168

25   (S.D. Cal. Mar. 9, 2010) (granting class certification in misclassification case, disregarding Jay

26   survey offered by Paul Hastings); *Marlo v. United Parcel Serv., Inc.,* 254 Fed. Appx. 568 (9th

27   Cir. 2007) (reversing summary judgment decision for the defendant-employer which was based,

28   in part, on the Jay survey offered by Paul Hastings).  Like other courts presented with similar

1    surveys, this Court should disregard Dr. Jay's irrelevant survey evidence; to paraphrase Einstein,

2    Paul Hastings cannot go back to the same dry well and realistically expect different results.

3          Time and again in wage and hour cases, courts have found Dr. Jay's surveys to be

4    "unpersuasive," "meaningless," and "inappropriate" because her survey evidence was not

5    relevant to the question before the Court. *In re FedEx Ground Emp. Practices Litig.*, 2007 WL

6    3027405, *13-14 (N.D. Ind. Oct. 15, 2007) (finding Jay survey of FedEx drivers "unpersuasive"

7    for the purpose offered because the wrong question was asked about conflicts between class

8    representatives and class members and was therefore "meaningless"); *Labrie,* at *19-20.  *See*

9    *also* Dr. Shari S. Diamond, *Reference Guide on Survey Research*, in the Fed. Judicial Ctr.,

10   Reference Manual on Scientific Evidence, pp. 229-276 (2nd ed. 2000), available from the

11   Federal Judicial Center online at http://www.fjc.gov ("Reference Manual") (a survey is not

12   probative evidence unless "it was designed to collect information relevant to the legal

13   controversy").  The Jay survey evidence offered here is no different.

14         **A.**    ***The survey offers no opinion relevant to the question before this Court.***

15         The question before this Court – whether AT&T Field Managers are subjected to "a

16   single decision, policy or plan" (see supra at p. 5) – was not asked or answered by the Jay survey.

17   Dr. Jay did not ask any Field Manager whether he or she was treated similarly to his or her co-

18   workers. Jay Report, p. 9-16, Appx. B.  In fact, according to Jay, the "primary purpose of the

19   survey" was to collect information about the merits of plaintiffs' claims such as: "(a) how many

20   technicians they supervise and what type of supervision they provide, (b) their job duties, (c) and

21   how they spend the majority of their time."  Jay Report, p. 1.  Thus, the survey focuses solely on

22   the merits of Plaintiffs' claims, not their suitability for collective treatment.

23         Consistent with its designed purpose, Defendants improperly offer the Jay survey to

24   challenge the merits of Plaintiffs' claims. Opp., p. 9.  ("The [Jay] survey … demonstrates that

25   most field managers are not subject to the strict control alleged by plaintiffs and instead regularly

26   exercise discretion and independent judgment.").   But, questions about merits are beyond the

27   scope of this Court's analysis on Plaintiffs' pending motion. *Labrie, supra*, at *19-20.

28         Moreover, the survey is irrelevant to whether "field managers across the state" are

---

similarly situated (Opp., at 22).   Jay interviewed only 367 of over 1,300 Field Managers in California (or 28%).  Jay Report, p. 1, 16.  Her 367-person subsample excluded over 70% of the class.  Jay Report, pp. 1, 16, 57-58, endnote 4-5.    Because Jay did not randomly select this subsample, her survey results cannot be generalized.[19]  Jay Report, p. 18, 57-58, endnote 4-5. Indeed, Dr. Jay made no attempt to demonstrate how her subsample is representative.  Reference Manual, p. 240 ("The survey report should contain a description of the target population, a description of the survey population actually sampled, a discussion of the difference between the two populations, and an evaluation of the likely consequences of that difference").[20]

By asking the wrong questions to a small fraction of Field Managers, Dr. Jay's survey adds nothing to assist the Court on the Notice Motion.  It is little more than a red herring.

### B.   The Survey should also be disregarded because it fails to meet acceptable scientific standards for survey research

In addition, the Jay survey fails to meet basic standards for producing reliable, statistically-relevant data.  In determining whether a survey was conducted in accordance with "accepted survey principles," most courts look to the Reference Manual, which identifies several reliability factors, including: (1) the survey's purposes and design: *Was the survey designed to address relevant questions*?; (2) population definition and sampling: *Was an appropriate population identified*?; *Did the sampling frame approximate the population? How was the sample selected to approximate the relevant characteristics of the population? Was the level of nonresponse sufficient to raise questions about the representativeness of the sample?  If so, what is the evidence that nonresponse did not bias the results of the survey*?; and (3) the survey questions and structure: *Were the questions framed to be clear, precise, and unbiased? See* Reference Manual, at 229-276; *see also Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc*., 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983).  On its face, the Jay survey is plagued with methodological

---

[19] Reference Manual at 242-44 ("when respondents are not selected randomly… [percentages] computed from such samples… should be viewed as rough indicators").

[20] Jay Report, pp. 18-19, Table 1.  Other than compare Field Managers' job status (i.e., current or former employees) and job location, Jay did nothing more to determine whether the survey respondents were evenly distributed across department, employment tenure, position or any other employment characteristics.  The company clearly has access to such information.

1    problems and design problems according to these factors.  It should be disregarded.

2               **1.  Jay's Survey Is Not Representative of the Class.**

3               Defense counsel provided Dr. Jay with a list of 1,301 Field Managers across California.

4    Jay Report, p. 16.  Of the 1,301 persons "eligible" to be surveyed, Jay threw out about half of

5    them because of such things as a bad phone number, a communication barrier or, **most notably,**

6    **Field Managers' refusal to concede to key legal terms – namely their characterization as**

7    **"supervisors."**  Jay Report, p. 9, 57-58, endnote 5 ("To be eligible for the Field survey,

8    respondents had to currently supervise outside technicians at AT&T or Pacific Bell or have done

9    so since 2006.").  After discarding approximately 50% of eligible field managers from her list,

10   Jay did nothing to determine whether the remaining 616 potential survey respondents were

11   representative of the Field Managers across California.   Reference Manual, p. 240.

12               **a.  Jay's Screening Questions Biased the Survey.**

13               Dr. Jay threw-out about 10% of all field managers based on her screening process alone.

14   To screen respondents to be surveyed, Jay asked three questions about supervision – one of the

15   ultimate legal questions in this case.  *See* 29 C.F.R. § 541.100 (General rule for executive

16   employees); 29 C.F.R. § 541.102 (Management); Jay Report, Appx. B, Survey Materials.

17   Questions C1a-C3, p. 2-3; *In re FedEx*, 2007 WL 3027405, at *13 (criticizing Jay for referring to

18   survey respondents as "contractors" eight times during the script because "the language primed

19   respondents to lean toward answers indicating an independent contractor relationship").

20               For example, Jay asked:  "Do you currently **supervise** (AT&T/Pacific Bell) technicians

21   who work outdoors or on customer premises, sometimes called outside technicians"?; and "Since

22   2006, have you **supervised** technicians at (AT&T/Pacific Bell) who work outdoors or on

23   customer premises, sometimes called outside technicians?;" Appx. B, Questions C1a-C3, p. 2-3

24   (emphasis added).  **If any Field Manager refused to answer these questions or took issue**

25   **with the loaded term "supervise" (containing a buried assumption that the employee**

26   **actually had the authority to "supervise" technicians), Jay declared him or her**

27   **"ineligible**."[21]   Consequently, 115 Field Managers (or almost 10% of the population) were

28
_____

[21] Jay Report, Appx B, Survey Materials, Question/Instruction C3, p. 3.

1   excluded.  Field Manager Survey, Disposition Codes, FRC-000141 ("Ineligible: Did not

2   supervise outside technicians since 2006: Total 115").  Talk about stacking the deck.  If Dr. Jay

3   had instead asked these discarded Field Managers whether they had technicians assigned to them

4   as direct reports, her survey may well have been more representative.

5        As the Reference Manual explains, in a proper survey, "screening questions must be

6   drafted so that they do not convey information that will influence the respondent's answers on

7   the main survey." *Id*. at 247.  By asking screening questions with respect to "supervision,"

8   respondents were conditioned to emphasize supervisory duties.  *See Pfizer Inc. v. Astra Pharma.*

9   *Prods*., 858 F. Supp. 1305, 1321-22 & n. 13 (S.D.N.Y. 1994); *In re FedEx*, <u>supra</u>, at *13.

10       Jay's screening questions required Field Managers to agree to characterize themselves as

11   supervisors in order to participate in the survey at all.[22]  To exacerbate the bias, Jay did not

12   define the term "supervise" anywhere in the survey.  *In re FedEx*, <u>supra</u>, at *13 (criticizing Jay

13   survey for using terminology which created bias by failing to define terms and asking "lay

14   persons to state preferences and understandings about a relationship that the law defines").  Jay's

15   screening questions alone make the survey results unreliable.

16          **b.  The Survey's Low Response Rate Must Be Regarded with**

17                **"Significant Caution."**

18       With over half the target population already discarded, an additional 249 Field Managers

19   refused to complete the survey.  These Field Managers were "unreachable," "unable or unwilling

20   to complete the interview" or "refused to participate."  Jay Report, 58, endnote 5.   In the end,

21   Dr. Jay completed 367 interviews – a response rate of only 28% (or 367/1301).  See "*Standard*

22   *Definitions: Final Dispositions of Case Codes and Outcome Rates for Surveys*" published by the

23

24

25   [22] Unlike the survey here, Dr. Jay's survey in another misclassification case asked "supervision"

26   questions within the survey itself, instead of as screening questions.  Wipper Dec. Ex. B, *Marlo*
*v. UPS*, No. 03-cv-4336, Jay Decl. p. 12-13 (C.D. Cal. Jan. 19, 2005) ("To determine whether

27   FTS perform managerial functions and exercise discretion and independent judgment, survey
respondents were asked the following questions:  Do you supervise any employees at UPS as (a

28   FTS job title)?   How many employees do you supervise at UPS as (a FTS job title)?").
Significantly, the *Marlo* survey was authorized *by the court*, not Dr. Jay.

American Association for Public Opinion Research, (2009),[23] page 35 (defining "response rate" as the number of complete interviews divided by the number in the population); *United States v. Dentsply Int'l, Inc*., 277 F. Supp. 2d 387, 437 (D. Del. 2003), *rev'd on other grounds* ("Any reasonable researcher has to calculate a response rate."). Presumably because her response rate was so low, Jay failed to mention it. Jay Report, p. 18 (instead reporting 60% cooperation rate).

Dr. Jay's 28% response rate falls well below the minimal standard of acceptance. A response rate of 90% or above is generally considered reliable, while 75-90% is usually reliable but warrants a "check" "on the representativeness of the sample." 75% or below triggers "greater scrutiny" for "potential bias." *A survey with a response rate below 50% is "regarded with **significant caution**."* Reference Manual, at 245 (emphasis added).

Despite the non-response bias in her survey, Dr. Jay did not take any steps to reduce the effect of such bias by analyzing why potential respondents refused to participate. *Marlo v. United Parcel Serv., Inc*., 251 F.R.D. 476 (C.D. Cal. May 19, 2008) ("Even when one begins with a random sample**,** one should take measures to assure that nonresponses are random and provide analysis of the reasons of nonresponse."). If Jay did analyze non-responses, the bias would have been apparent. For example, Don Whitehouse: "declined the survey because I felt uncomfortable… the caller made me feel that refusing the survey would negatively impact my job. I felt threatened enough that I asked him, 'Are you threatening me with my job?' I continued to refuse the survey." Melzer Ex. U, ¶ 7. *See also* Ex. S, Port Decl. ¶ 8.

Thus, the Jay survey's low response rate renders the results unusable.

### 2. By Identifying AT&T as the Sponsor, Jay Biased the Results

By identifying AT&T as the sponsor of the survey, Dr. Jay designed a survey certain to elicit biased responses. As with other forms of scientific research, the "gold standard" of survey research is the "double-blind experiment." *Albert v. Warner-Lambert Co.*, 234 F. Supp. 2d 101 (D. Mass. 2002)("Industry practice requires, whenever possible, that [survey] research be 'double blind,' that is, that both the interviewer and the respondents are blind to the sponsor of

---

[23] Available at http://www.aapor.org/AM/Template.cfm?Section=Standard_Definitions1& Template=/ CM/ContentDisplay.cfm&ContentID=1814

the survey..."); *Accord*: Reference Manual at p. 266 (warning against any explicit or implicit clues as to sponsorship or expected responses).  Jay's claim that the survey is "double blind" (Report, at 8) is false.  Her interviewers told survey respondents: "(AT&T/Pacific Bell) has asked us to interview a representative sample of its current and former field managers."  *Id*. p. 9, Appx. B, Questionnaire, p. 2.  Interviewers also assured the Field Managers that AT&T had approved the survey and directed them to AT&T Human Resources if they had questions. Whitehouse Decl. ¶ 8; Port Dec. ¶¶ 5, 6; *Script for Human Resources*, FRC-000116-118.

By revealing AT&T as the survey's sponsor and directing potential respondents to AT&T Human Resources, Dr. Jay biased the results.  For example, some potential survey respondents refused to participate because of AT&T's involvement.  *See* Port Decl. ¶ 5; Whitehouse Decl. ¶¶ 7, 13. Other interviewees may have felt coerced to cooperate and to give the preferred responses.

Dr. Jay touts the fact that Field Managers were not advised of the survey's purpose and connection to the lawsuit.  Having abandoned the double-blind paradigm, the company cannot have it both ways.  The respondents were influenced by the company's sponsorship and felt pressured and intimidated because their employer was asking the questions.  Hence, the company improperly and deceptively engaged in *ex parte* contacts with its employee class members without even the barest of disclosures.[24]  *Cf*., *e.g*., *Longcrier*, <u>supra</u>.  *See also* Model Rules 8.4(a), 8.4-2(b) (attorneys prohibited from violating ethical precepts through acts of another).

### 3.  <u>Dr. Jay Used Biased Survey Questions</u>

Finally, the survey suffers from fatal design flaws. The questions were not objective.  For example, Jay used screening questions about supervision, as discussed above.  Other questions used biased words and phrasing designed to lead to a specific or desired response.   For example, Jay used circular questions with the response as a foregone conclusion such as "*As an AT&T/ a Pacific Bell field manager, about how many outside technicians do you supervise*?;" Jay Report, p. 10.  Similarly, Dr. Jay asked: "*would you say (a) you (spend/spent) 50 percent or less of your*

---

[24] Dr. Jay's survey in *Marlo v. UPS*, conducted under the supervision of the court, took the exact opposite tack.  Interviewers told the employees that the survey was "being conducted in connection with a class-action law suit" but did not tell them that it "was being conducted on behalf of UPS."  Wittels Dec. Ex. , Jay Decl. in *Marlo* at 2.

*time each week performing these duties or (b) you (spend/spent) more than 50 percent of your time each week performing these duties?"* Jay Report, p. 15.  Dr. Jay should have first asked (as a question not a screen-out) whether respondents perform *supervisory* duties at all.  Omitting prefatory questions, Dr. Jay designed the surveys to lead to the desired response of her client.

Additionally, a "yes/no" response format commonly elicits biased responses.  It results in inaccurate data because it encourages "acquiescence" (the tendency of respondents in some surveys to agree, known as "yeah-saying") and "social desirability" (the desire to present oneself in a favorable light).  *See* Krosnick & Presser*, "Question and Questionnaire Design*" from the second edition of the Handbook of Survey Research, (2010), p. 275  (Wipper Dec. Ex. C) (a yes/no "question format may be problematic.  People may sometimes say 'agree,' 'true,' or 'yes' regardless of the question being asked of them… This behavior, labeled 'acquiescence,' can be defined as endorsement of an assertion made in a question, regardless of the assertion's content… The evidence documenting acquiescence by a range of methods is now voluminous.")

Dr. Jay used a "yes/no" format in nearly half the questions in her survey, including C1a, C1b, C2a, E2, E7b, E8, E9, F1, F3, G7, G8, G10, G11, H1a, H2a, H3, H4a, H5, H6, H7a, H8, J1, J2, J3, J5, K1, K5, K6, M1a, M1b, M3a, M3b.  Jay Report, Appx. B, pp. 1-12.  Indeed, the most contested questions used in the survey followed this "yes/no" format, including questions regarding the Field Managers' roles in suspensions and terminations.  Questions H3, H4a, H5, H6, H7a H8, pp. 8-9.  In every question using this biased response format, "yes" was AT&T's desired response.  Krosnick & Presser, *Question and Questionnaire Design*, at 276 ("people are much more likely to answer yes/no factual questions correctly when the correct answer is 'yes' than when it is 'no', presumably because people are biased towards saying 'yes.'").  And, the closed-end nature of the questions did not give the respondents an opportunity to describe their job duties in any meaningful way.  *E.g.* Pokorny Dec. ¶ 9; Rodriguez Dec. at ¶¶ 6-7.

## VII.   Notice to the Class of Field Managers is Particularly Justified to Counteract Defendants' Misleading and Improper *Ex Parte* Contacts, Which Have the Potential to Chill Participation and Taint the Class

As set forth in the previous sections, Defendants and their attorneys and agents have

1    engaged in widespread misleading, improper, and coercive *ex parte* contacts with the employee-

2    class members.  On behalf of the company, Dr. Jay called hundreds of Field Managers to

3    question them about their duties; it is unknown how many Level Ones the company's lawyers

4    called and interviewed in order to obtain the thirty declarations.[25]  The case law (see supra at )   .

5    recognizes that such one-way communications have the significant potential to deter

6    participation, intimidate the potential plaintiffs, and taint the action.   Plaintiffs' Reply

7    Declarations confirm that this may be precisely what is happening.  *See* Melzer Dec. Exs. M-P

8    Level One Declarants' Counter Declarations; Ex. S, Port Dec. ¶ 8; Ex. U, Whitehouse Dec. ¶¶ 7,

9    14; Ex. T, Rodriguez Dec. ¶ 9.

10    Thus, notice to the class members is particularly necessary to counteract the fruits of

11    AT&T's actions.  The proposed notice (Doc. 35-3, Motion Ex. B) provides accurate information

12    about the lawsuit, informs the Field Managers of their right to participate, and counsels that

13    retaliation by the company is strictly prohibited by law.  Field Managers are invited to contact

14    Plaintiffs' counsel or their own attorneys for more information or for purposes of representation.

15    Where a defendant has improperly communicated with potential members of a class,

16    courts regularly authorize corrective notice.  *See, e.g., Russell*, 2008 U.S. Dist. LEXIS 78771, at

17    *10-11 (authorizing corrective notice where defendant-employer improperly attempted to secure

18    FLSA releases); *Mevorah*, 2005 U.S. Dist. LEXIS 28615, at *16-18 (authorizing corrective

19    notice where defendant-employer conveyed misleading information to employees); *Li*, 2010 U.S.

20    Dist LEXIS 107792, at *22, 26 ("*ex parte* communications soliciting opt-outs or even simply

21    discouraging participation…require curative action"; issuing corrective notice); *Georgine v.*

22    *Amchem Prods.*, 160 F.R.D. 478, 502 (E.D. Pa. 1995) (ordering curative notice to class members

23    who opted out due to false information); *Sjoblom*, 2007 U.S. Dist. LEXIS 94829, at *11 (some

24    form of corrective notice to employee-declarants warranted if conditional certification granted).

25    Here, PacBell/AT&T has engaged in improper communication with potential class

26    members.  The employee declarations submitted by the company, each one crafted to foreclose

27

28    ---
[25] AT&T acknowledges that at least five opt-ins were improperly included in the survey despite being represented parties.  (*See* Melzer Exs. Q, V)  The company even apparently contacted a named Plaintiff to question him about his job. (*See* Ex. W, Richardson Reply Dec.)

1   the declarant from pursuing his or her FLSA overtime claims, amount to illegally-solicited

2   waivers.  Further, the phone survey conducted by Deborah Jay was improper and appears to have

3   resulted in intimidation.   Notice is warranted to provide the Field Managers with neutral,

4   accurate information about the lawsuit and a fair opportunity to participate.[26]

5                                    <u>**CONCLUSION**</u>

6           Defendants' opposition to the Motion is little more than smoke-and-mirrors designed to

7   distract from the minimal notice-stage standard.  *Cf.*, *e.g.*, *Zhao v. Benihana, Inc.*, 2001 U.S.

8   Dist. LEXIS 10678, at *11 (S.D.N.Y. May 7, 2001)(defendant "seeks to contest the merits of

9   plaintiffs' claims more vigorously than is necessary at this stage"); *De Asencio*, 130 F. Supp.2d

10  at 663-64 (warning of "chicken-and-egg limbo" if plaintiff forced to counter each of defendant's

11  assertions at preliminary stage).  And, their evidence rests on an ethically-corroded foundation of

12  *ex parte* contacts with the company's employee-class members.  Plaintiffs respectfully request

13  that the Court: 1) conditionally certify this suit as a collective action pursuant to 29 U.S.C. §

14  216(b); 2) order Defendants to provide to Plaintiffs the names and contact information or all

15  members of the collective class; and 3) authorize Plaintiffs to send them the proposed Notice.[27]

16

17

18

19

20

21  [26]  In addition to corrective notice, Plaintiffs request that the company and its attorneys and
    representatives be barred from further contacts with Field Managers on the subject of the lawsuit.
22  *See*, *e.g.*, *Sjoblom*, 2007 U.S. Dist. LEXIS 94829, at *10-11; *Longcrier*, 595 F. Supp.2d at 1231.

23  [27]  Defendants' objections regarding the form of the Notice (Doc. 35-3) are unfounded.  The
    proposed Notice is similar in structure and language to the notice approved in *Perkins*. (*See*
24  Ex. Z to Melzer Decl.)    The notice 1) clearly explains the basis of the lawsuit, 2)
    unambiguously informs potential plaintiffs that "**YOU SHOULD NOT INTERPRET THE**
25  **SENDING OF THIS NOTICE AS ANY INDICATION OF THE COURT'S OPINION OF**
    **THE ULTIMATE OUTCOME OF THIS CASE**," 3) properly identifies the individuals that
26  would be eligible to join the class ("**ALL FIELD MANAGERS (LEVEL ONE MANAGERS**
    **WITH FIELD TECHNICIANS**"), 4) informs potential plaintiffs of how their rights would be
27  impacted by joining the class and of their right not to join the suit, and 5) states that Defendants
    deny wrongdoing.  *See*, *e.g.*, *Hoffmann-La Roche*, 493 U.S. at 174; *Adams v. Inter-Con Sec. Sys.,*
28  *Inc.*, 242 F.R.D. at 540-41 (N.D. Cal. 2007).

Date: October 15, 2010
    San Francisco, California

                          By:         /s/ Thomas Marc Litton
                                Thomas Marc Litton (SBN 119985)
                                tlitton@nydclaw.com
                                **SANFORD WITTELS & HEISLER, LLP**
                                555 Montgomery Street, Suite 820
                                San Francisco, CA 94111
                                Telephone: (415) 421-4774
                                Facsimile: (415) 421-4784

                                Steven L. Wittels (*pro hac vice*)
                                swittels@nydclaw.com
                                Jeremy Heisler (*pro hac vice*)
                                jheisler@nydclaw.com
                                **SANFORD WITTELS & HEISLER, LLP**
                                1350 Avenue of the Americas, 31st Floor
                                New York, NY 10022
                                Telephone: (646) 723-2947
                                Facsimile: (646) 723-2948

                                Michael Ram, CA Bar No. 104805
                                mram@ramolson.com
                                Karl Olson, CA Bar. No. 104760
                                kolson@ramolson.com
                                **RAM & OLSON LLP**
                                555 Montgomery Street, Suite 820
                                San Francisco, CA 94111
                                Telephone: (415) 433-4949
                                Facsimile: (415) 433-7311

                                Edmond Clark  (*pro hac vice*)
                                Eclarkmadisonlaw.@aol.com
                                **LAW OFFICE OF EDMOND CLARK**
                                83 Scotland Avenue
                                Madison, CT 06443-2501
                                Telephone: (203) 245-4602
                                Fax: (203) 245-9734

                                *Attorneys for Plaintiffs Joe Lewis Luque,*
                                *Herman Richardson, and the Plaintiff Class*

31